Argued January 15; suspension ordered March 11; rehearing denied
April 1, 1941

# In re MOYNIHAN

(111 P. (2d) 96)

Before Kelly, Chief Justice, and Belt, Bailey,
Lusk, Rand and Rossman, Associate Justices.

*Custer E. Ross*, of Salem (Ross & Ford and Asa Lewelling, all of Salem, on the brief), for petitioner.

*P. L. Patterson*, of Hillsboro, for Oregon State Bar.

BAILEY, J. The Oregon State Bar on January 21, 1937, filed a complaint against M. Clifford Moynihan, a duly admitted attorney of the state of Oregon, charging him with falsely testifying with intent to mislead and deceive the circuit court of the state of Oregon for Marion county, and with signing an untrue and false affidavit to be used in a cause pending in that court, with like intent to deceive and mislead. The trial committee found Mr. Moynihan guilty of both charges and recommended that he be suspended from the practice of law for three years. The Board of Governors, after hearing oral argument by counsel representing Mr. Moynihan and reviewing the record taken before the trial committee, adopted the findings and recommendation of that committee. Mr. Moynihan has petitioned for a review of the findings and recommendation of the Board of Governors.

On or about March 30, 1934, Verne L. Ostrander and his wife purchased from Don C. Smith and his wife a five-acre tract of land a short distance outside the city limits of Salem. Mr. Moynihan represented the Ostranders in examining the abstract and drafting the necessary legal papers.

The purchase price of the property was $3,500. At the time of purchase there was a first mortgage of $2,000 on the property, held by Miss Crowley, which

mortgage was renewed; and a second mortgage for $1,000 was given by the Ostranders to the Smiths. The Ostranders defaulted on the second mortgage and in May, 1935, the Smiths instituted suit to foreclose that mortgage. The Ostranders filed an answer and counter-claim, alleging misrepresentation, fraud and lack of consideration.

During the trial of the foreclosure suit Mr. Moynihan, on November 14, 1935, was called as a witness for the plaintiffs and in answer to questions about the purchase and who were present during some of the negotiations, gave the following testimony:

"Yes, at one time, I believe Miss Crowley and Mr. and Mrs. Smith were present in addition to Mr. and Mrs. Ostrander. The Ostranders were doubtful of the payment of $3,500, whether the place was worth that or not, and I called, at their request, Henry Crawford and, I believe, Joe Albert, and asked their opinion of the value of the property out there.

"Q. And was the value given you? A. Yes. * * * Mr. Crawford and, I believe, Mr. Albert said land out there was worth about $500 an acre.

"Q. Was that told to the folks there present by you. A. I called on the telephone in their presence. Q. They couldn't hear what he said? A. I told them what was said."

It is the giving of the foregoing testimony that forms the basis of the first charge against Mr. Moynihan.

The circuit court announced its decision in favor of the Smiths, plaintiffs in the foreclosure suit, and thereafter a petition was filed by the Ostranders, asking for a rehearing on the ground, among others, of newly discovered evidence to refute the above testimony given by Mr. Moynihan on the trial of the case. In this petition it is alleged that such testimony was false; that Moynihan never at the request or in the

presence of the Ostranders or either of them or otherwise or at all called Joseph H. Albert and Henry R. Crawford or either of them; and that neither Mr. Albert nor Mr. Crawford stated to Moynihan that the property involved was worth about $500 or any other sum or amount per acre. Attached to the petition were affidavits of both Mr. Albert and Mr. Crawford, to the effect that the respective affiants, to the best of their recollection and belief, had not been called by Mr. Moynihan nor had they conversed with him relative to the value of the land involved in the litigation. Both affiants stated that they had never told Moynihan that the property was worth $500 per acre, and Mr. Albert added that it was his opinion and belief that the land involved was worth not to exceed $200 an acre, exclusive of improvements. Mr. Crawford stated that he was not familiar with, or informed as to, the land in question.

An affidavit was made by Mr. Moynihan in opposition to the petition for rehearing, in which, among other things, he stated:

"That notwithstanding the statement of defendants' counsel, affidavits of Joseph H. Albert, and Henry R. Crawford, I did call Henry R. Crawford, and I believe Joseph H. Albert, and that should I be required to again testify, I would testify to the same effect. That further, the statement of counsel is untrue, that I stated that the value of the land was worth $500 an acre, and that that price was quoted to me by the men herein mentioned, in that the $500 per acre, which they stated was a reasonable price, was for the 5 acre tract, together with the improvement thereof. And that when I talked with the said Henry R. Crawford, about this particular tract of land he told me at that time, that he had the matter very clearly in mind, as he had been recently in contact with property close

by, and had it clearly in mind as to the location and the buildings thereon.''

The above part of Mr. Moynihan's affidavit is the basis of the second charge of unprofessional conduct against him.

As part of each of the charges against Mr. Moynihan it is averred in the complaint that the testimony given by him both orally and by deposition was material to the issues of the case pending in court; that the testimony given by Mr. Moynihan was then and there known by him to be false and untrue; and that such testimony was then and there given by him ''wrongfully, falsely and fraudulently with the intent to mislead and deceive the said circuit court of the state of Oregon for the county of Marion.''

The affidavit from which the above-quoted excerpt was taken states that the affiant had read the petition for rehearing. In that petition the testimony of Mr. Moynihan hereinbefore quoted was set forth in full, and therefore, Mr. Moynihan, before making the affidavit, had read the testimony which he gave on the trial of the foreclosure suit. The last paragraph of his affidavit is as follows:

''That I note from the affidavits of Joseph H. Albert, and Henry R. Crawford, that they do not unqualifiedly state in said affidavit,—that I did not call them and converse with them, but state, 'to the best of my recollection, and belief,' and that the said Joseph H. Albert, and Henry R. Crawford, can not honestly and truthfully, unqualifiedly state that I did not call them or converse with them about the property involved in this suit.''

Mr. Moynihan in his affidavit denies that he testified that Mr. Crawford or Mr. Albert told him that

land in the vicinity of the five-acre tract was worth $500 an acre, and asserts that what he did testify was that they had stated to him that $500 an acre was a reasonable price for the five-acre tract together with the improvements on it. According to this affidavit, the information which Mr. Moynihan received was that the entire tract being purchased by the Ostranders was worth $2,500, whereas the price they were paying was $3,500.

In the last-quoted excerpt from Mr. Moynihan's affidavit, the affiant at least gives the impression that he talked to both Mr. Albert and Mr. Crawford about the value of the land involved in the foreclosure suit.

Before discussing the evidence it is well to analyze the testimony given by Mr. Moynihan as above quoted. This testimony may be summarized as follows: (1) that Mr. and Mrs. Ostrander were present when the telephone conversation was had; (2) that the Ostranders were doubtful that the property was worth $3,500 and that he called, at the Ostranders' request, Henry R. Crawford and, he believed, Joseph H. Albert, and asked them their opinion of the value of the "property out there"; (3) that Mr. Crawford and, he believed, Mr. Albert told him that "land out there" was worth about $500 an acre; and (4) that he, Moynihan, told those present what was said in conversation over the telephone.

A conference was held in Mr. Moynihan's office on or about March 30, 1934. Present were Mr. Moynihan, Mr. and Mrs. Smith and Mrs. Briedwell, who is also mentioned in the testimony and affidavit of Mr. Moynihan as Miss Crowley, which was her name prior to marriage. There is a dispute as to the presence of

Mr. and Mrs. Ostrander or either of them. Both of them testified that they were not present. Mrs. Briedwell and Mr. Smith also stated that the Ostranders were not present at the conference, and Mrs. Smith said that she did not remember whether they were there. Mr. Moynihan and his law partner, Mr. Thompson, were positive that both the Ostranders were in the waiting room outside Mr. Moynihan's office.

It was during this conference that the purported telephone calls are alleged to have been made. Mr. Moynihan's contention is that he called Mr. Crawford and Mr. Albert at the suggestion of Mrs. Ostrander. Mr. and Mrs. Smith stated that the two men were called at the instance of Mrs. Briedwell.

Mrs. Briedwell was at the time of testifying before the trial committee a supervisor of the elementary grades of the Salem public schools and had taught in those schools for the preceding fourteen years. She inherited as a part of her mother's estate a $2,000 mortgage on the property sold by the Smiths to the Ostranders. The mortgage was originally given for $3,000, when one Doty purchased the property at a valuation of $6,000. Later, $1,000 was paid on the principal of that mortgage. At the time of the sale from the Smiths to the Ostranders the mortgage was past due. Mrs. Ostrander called upon Mrs. Briedwell, told her that she and her husband were contemplating purchasing the property from the Smiths, and wanted to know whether Mrs. Briedwell would extend the mortgage. After Mrs. Briedwell was informed by Mrs. Ostrander that the latter's husband had a steady position with the federal government, and was assured by Mr. Moynihan that such was the fact, she consented to take a mortgage from the Ostranders for $2,000.

At the request of Mrs. Ostrander or some one in Mr. Moynihan's office, Mrs. Briedwell came to that office one Saturday morning, where she met Mr. Moynihan and Mr. and Mrs. Smith. Before going to the office that morning she went to the Ladd & Bush bank and there inquired of Mr. Chester Cox the prevailing rate of interest on mortgages such as the one contemplated. Her reason for doing this, she testified, was that the Smiths had told the Ostranders without her knowledge that the rate of interest on the existing mortgage would be reduced from seven per cent to six and one-half per cent. Mr. Cox advised her that six and one-half per cent was the proper rate of interest to charge.

At the hearing before the trial committee, Mrs. Briedwell was called as a witness before the Smiths gave their testimony, and again in rebuttal. She stated that she had seen Mr. Crawford and Mr. Albert many times at the bank and at the beach. She knew that Mr. Crawford was the "field man" and Mr. Albert the "trust man" of the Ladd & Bush bank. She testified that they were not called at her request about the value of the land, and that she had no recollection of Mr. Moynihan's telephoning to either of them. She further testified as follows:

"Q. I assume, however, that you would remember whether there was or was not some discussion about the value of the land. A. Absolutely nothing, that I could remember, that it would be necessary for him to have a call on that account."

She stated that she had come to an agreement about renewing the mortgage before she went to Mr. Moynihan's office and that she had never had any doubt as to the value of the property to support a mortgage

for $2,000, and the only question in her mind was whether Mr. Ostrander had steady employment so that he would be able to pay the interest when due. She went to Mr. Moynihan's office to have the mortgage from the Ostranders to her prepared. While she was there the Smiths paid her the interest to date on their mortgage.

On direct examination Mrs. Briedwell testified that neither of the Ostranders was in Mr. Moynihan's office when she was there; that she was in that office only once; and that she did not meet Mr. Ostrander until August, 1934. On rebuttal she testified that she did not recall seeing Mrs. Ostrander in Mr. Moynihan's waiting room. Later, she was asked if she had any recollection of the Ostranders' being there, and replied in the negative. She was then asked, "And that is as strong as you care to put it—that you have no recollection?" She answered: "Well, I am absolutely positive that Mr. Ostrander wasn't there and I am just about as positive that Mrs. Ostrander wasn't there. I have this feeling, that they were supposed to have been there. I was in a hurry. I went away and the papers were brought to me after the Ostranders signed."

On April 24, 1936, Mrs. Briedwell made an affidavit which was incorporated in the circuit court proceedings on the petition for rehearing in the foreclosure suit. In that affidavit she set forth facts substantially as testified to by her before the trial committee. After this disbarment proceeding was instituted, Mr. Moynihan consulted her to ascertain her version of what occurred in his office on the occasion when she was there. She had, therefore, prior to testifying before the trial committee, had occasion to re-

fresh her memory as to what actually occurred in Mr. Moynihan's office. At the hearing before the trial committee she was asked if she had any recollection of the conversation which Mr. Moynihan had with Mr. Crawford, and answered: "No, I don't. I have absolutely no memory of it. I've thought just as hard as I could although I can't remember such a conversation. I was there such a short time. I was eager to get away because I was going on a trip."

Mr. Henry R. Crawford in 1934 was the field representative and appraiser for the Ladd & Bush bank. At the time of the hearing before the trial committee he was postmaster of Salem. He had then known Mr. Moynihan for some ten years. He had no recollection, he testified, of Mr. Moynihan's calling him about the value of the property herein mentioned, he had never been over the property, he would have to see it before he would give an opinion as to its value, and he was not in the habit of giving his opinion over the telephone concerning the value of property that he did not know. On cross-examination he thus testified:

"Q. You say you wouldn't express an opinion about the value of a piece of property without knowing pretty well where the property was? A. Well, I certainly wouldn't give an opinion of the value without knowing the property.

"Q. Knowing what you do about property out Center street, or what you did know about it in March, 1934, would you have expressed an opinion about the value? A. Not unless I knew specifically.

"Q. If you, yourself, knew it? A. I would have to know it myself.

"Q. Then you didn't know this specific property?

"Mr. Patterson: Was it your habit to refrain from expressing an opinion on valuations unless you, yourself, were familiar with the property? A. Yes, it was."

Mr. Joseph H. Albert testified that he was, in the month of March, 1934, trust officer of Ladd & Bush Trust Company; that he then had known Mr. Moynihan six or seven years; that he was familiar with values of property in the vicinity of the tract, as he had spent his life in Salem; but that he never, to the best of his knowledge and belief, talked to Mr. Moynihan about the value of the property here involved. "It's highly improbable," he stated, "that he called me and it would not be possible, if he had, for me to give him those values, if he did call. That's why I say, to the best of my knowledge and belief that he never called." Asked if he told Mr. Moynihan that the value of properties in that vicinity was $500 an acre, he answered: "I did not, and the reason I say I did not, without qualification, is that I never had any idea they were worth anywhere near that value." Mr. Albert further stated that his answer concerned unimproved property; that he had never been on the tract herein mentioned and was unfamiliar with the improvements on it, and that in order to give an estimate of value he would have to know the character of improvements; also, that the value of unimproved land in that neighborhood was, in March, 1934, about $125 to $150 an acre.

Mr. Ostrander testified that he was never in Mr. Moynihan's office at the same time that the Smiths were there; that he had not been in Mr. Moynihan's office in connection with the purchase of the Smiths' property until some two months after that purchase was completed; that the papers connected with the transaction were brought to his home for his signature and that of his wife; that the first time he ever heard anything concerning the alleged telephone con-

versation had by Mr. Moynihan with Mr. Crawford and Mr. Albert was at the trial of the foreclosure suit; and that most of the negotiations for the purchase of the Smith property were carried on by his wife. He further testified that he did not know why Mr. Moynihan came to his home at the time negotiations were being carried on by himself and his wife with Mrs. Smith and Mrs. Ellis, a real estate agent.

Asked on cross-examination if he ever went to see Mr. Moynihan or said anything to him about the value of the property, Mr. Ostrander answered: "No. He came to my house while we was making out the earnest slip and called me out in the back room or the kitchen and wanted to know if I was going to buy this property. He said he wanted it if I didn't. Said it was a good buy and that he would take it if he was me." Mr. Ostrander further testified that Mr. Moynihan asked him what he was paying for the property and when told that the price was $3,500, Mr. Moynihan said that he would buy it, if the Ostranders did not.

Mrs. Ostrander testified that she went to call on Mrs. Briedwell at the apartment of the latter before the earnest-money receipt was signed (the date of which signing was March 23, 1934), to ascertain whether Mrs. Briedwell would extend the mortgage in the event that the Ostranders purchased the property from the Smiths; and that upon being assured that Mrs. Briedwell would extend the mortgage, she continued negotiations with Mrs. Smith and Mrs. Ellis. She never was in Mr. Moynihan's office, she stated, when Mrs. Briedwell or Mr. Smith was there. She did not meet Mr. Smith until after she and her husband had moved onto the property purchased from the Smiths. She further stated that Mr. Moynihan had never at

her request called either Mr. Crawford or Mr. Albert; and that he had never told her about any conversation had by him with Mr. Crawford concerning the value of the property, nor had she ever heard that Mr. Moynihan had called the two men until he testified to that effect at the trial of the foreclosure suit.

Mrs. Ostrander stated that she had been somewhat concerned about the value of the property and that she had spoken to Mr. Moynihan about it. She testified that Mr. Moynihan ''was supposed to look up and find if it was a good buy.  *  *  *  We depended on Mr. Moynihan quite a bit and he thought it was a good buy.'' Further testimony by Mrs. Ostrander was as follows:

''Q. You told him to look up everything and see if everything was all right, did you? A. Yes. Q. What did he say about that? A. He said he would take care of everything.

''Q. Did he afterwards tell you he had talked to anybody? A. He said he had made inquiries. Q. Did he tell you of whom he had made inquiry? A. No. He did not. No.''

When Mr. Moynihan testified before the trial committee in April, 1937, he was thirty-nine years of age. He was admitted to practice in the courts of the state of Oregon in 1927.

He had known Mr. Ostrander since 1928 or 1929 and Mrs. Ostrander since about 1931. At the time of the transaction between the Smiths and the Ostranders he had been Mr. Ostrander's attorney for some years.

In order to know the background of the offenses charged, the trial committee permitted Mr. Moynihan

to relate what he knew of the negotiations between the Smiths and the Ostranders. He testified that Mrs. Ostrander had telephoned to him and asked him to come to the Ostrander home. On his arrival there, Mr. Ostrander met him outside the house and took him into the kitchen, where, according to Mr. Moynihan's testimony, Mr. Ostrander showed him the earnest-money receipt prepared by the real estate agent in connection with the purchase of the Smith property by the Ostranders, and asked him what it was. He told Mr. Ostrander that it was an earnest-money agreement to purchase real property, but he did not advise him as to the legal effect of the document or whether it was a proper form of contract.

Mr. Moynihan testified that Mrs. Ostrander "was terribly worried about the value of the property," as this was the first land the Ostranders had bought, and asked him "to inquire around and find out whether or not that was a reasonable price to pay for the property . . . and in compliance with her request, I called first, Henry Crawford and asked him what he thought the property was worth. I described the buildings, where it was located, and Henry Crawford told me positively and absolutely that he had just appraised property in that neighborhood and he thought that price a reasonable price. I afterwards called Joe Albert at home and I told him what Henry Crawford had said about the property, by that I do not mean that Henry went out and looked at the property, nor do I mean that Joe Albert went out and looked at the property. They did not. They merely took the information which I gave them of the description of the property and rendered what they thought was the fair price of the property which I

had spoken to them about. I reported that to Mrs. Ostrander."

Mr. Moynihan stated later on in his testimony that he would not say that he had made the report to Mrs. Ostrander on the day that he telephoned the two men named. According to his testimony in the foreclosure suit, at the time he claims to have had the telephone conversation with Mr. Crawford and to have attempted unsuccessfully to reach Mr. Albert by telephone, there were present in his office Mrs. Briedwell, the Smiths and the Ostranders. After he testified at the trial of the foreclosure suit, he stated, he had refreshed his memory through talking with others and was certain that the only people present in his office, which was quite small and "three people could just about get in it," were the Smiths and Mrs. Briedwell; and the Ostranders were in the waiting room where, "unless something was wrong with their hearing," they could have heard everything said in his private office. Asked why he had called Mr. Crawford and Mr. Albert at that time, he gave the following testimony:

"I suppose I just happened to remember it.

"Q. You were not conferring directly with her [Mrs. Ostrander] at that time? A. Not at that time, no.

"Q. Did she subsequently come into your office that day? A. She must have heard, she was sitting right out there."

Mr. Moynihan further stated that Mrs. Ostrander had asked him "to make inquiries and I made inquiries" as to "the value of that property, not so much per acre but the whole thing, the buildings and all of it." He did not state anywhere in his testimony that Mrs. Briedwell had made inquiries of him as to the value of the property or had asked him to find

out that value, or that he had called Mr. Crawford or Mr. Albert on Mrs. Briedwell's account.

Mr. Moynihan testified that he had told Mrs. Ostrander, after the deal was completed, "that if she was dissatisfied with the deal she had made and wished to back out of it, that I would take over the contract and indemnify her against any loss".

Mr. Smith testified that he had met Mrs. Ostrander "right outside of the building" and that she had directed him how to reach Mr. Moynihan's office. She told him that "she had left everything in Mr. Moynihan's hands and anything that we did in there that would be all right." He stated that he and his wife met Mrs. Briedwell at Mr. Moynihan's office to arrange the $2,000 mortgage, and that the consummation of the sale to the Ostranders depended upon whether Mrs. Briedwell would renew the mortgage. Mrs. Briedwell had hesitated, he said, about renewing the mortgage when she found out that the Ostranders were paying $3,500 for the tract of land and that the Smiths had paid $7,000 for the property "a couple of years before." Mr. Moynihan then, according to Mr. Smith, to reassure Mrs. Briedwell as to the value of the land, offered to call up "two men in town here that had knowledge of land values and see what they thought of it." Mr. Moynihan then tried to get Mr. Albert on the telephone but was unable to do so, and succeeded in reaching Mr. Crawford, whom he asked if he knew "anything about the value of land, unimproved land, out in that neighborhood." He was advised, according to Mr. Smith's testimony, that Mr. Crawford had just made an appraisal of property in that district and Mr. Moynihan "repeated" over the telephone, "five hundred dol-

lars an acre''. Mr. Smith further stated that Mr., Moynihan did not say anything to Mr. Crawford about improvements on the property under discussion.

On cross-examination Mr. Smith's attention was called to the fact that his wife testified that they had paid $6,000 for the property, and he stated that she was probably right, that they had traded other property for this tract. He remembered that it was Mr. Crawford to whom Mr. Moynihan telephoned, from the circumstance that he had a friend of the same name. The reason given by him for Mr. Moynihan's not mentioning to Mr. Crawford the improvements on the tract was that he, Mr. Smith, had brought to Mr. Moynihan's office a detailed description of the improvements.

Mrs. Smith testified that she and her husband had made arrangements to meet Mrs. Briedwell at Mr. Moynihan's office to discuss the question of whether Mrs. Briedwell would agree to six and one-half per cent interest on the Ostranders' mortgage; that during the conference it was mentioned that the Ostranders were paying $3,500 for the property and Mrs. Briedwell showed some concern as to whether the tract was of sufficient value to support a $2,000 mortgage; that it was suggested that they call some one to inquire about the value; that she, Mrs. Smith, heard Mr. Moynihan trying to get Mr. Albert on the telephone but not succeeding because Mr. Albert was out; and that she then heard him dial again and ask for Mr. Crawford. She said that she heard Mr. Crawford's response over the telephone, as she was sitting across a table from Mr. Moynihan. She thought, she first stated, that Mr. Crawford's appraisal referred to improved property, and when reminded of

the fact that $500 an acre would amount to only $2,500, she stated that she thought the value mentioned by Mr. Crawford was probably that of the land without improvements. Mrs. Smith said that she was positive that the Ostranders were not in the room with them, but possibly were outside that room, although she did not remember.

Mr. Kenneth G. Thompson, an attorney who had been sharing offices with Mr. Moynihan since 1930, testified that the Ostranders were in the waiting room and the Smiths and Mrs. Briedwell were in Moynihan's office; that he was in his own private office; and that the doors to both his office and that of Moynihan were open and he heard Moynihan's part of the conversation had by him with Mr. Crawford. He further testified as follows:

" . . . They [those present in Mr. Moynihan's office] had been arguing about the valuation on this property, and I heard him [Mr. Moynihan] call for Henry Crawford and he asked if this was Henry Crawford and he asked if he knew the value of property, then he gave a description of the locality of this property, and my recollection of the words were: 'Oh, you have just made an appraisal in this section? Well, that's fine.' Then he went on to discuss it with him. Following that there was an endeavor to call Mr. Albert. My recollection is that he did not get him.

"Q. Or at least you didn't hear about it if he did? A. I did, later.

"Q. What was that conversation? A. It was to the same effect with the exception that he explained to him that he had called Henry Crawford and he had to go into a little more detail with Joe Albert. It was after these people had gone, I remember, in the afternoon.

"Q. When was that? A. When this took place I would say it was around five o'clock.

\* \* \* \* \*

"Q. Do you know whether or not Mr. Moynihan told the parties in his room about what the conversation had been? A. I did hear the conversation but paid no attention to it. They discussed it back and forth.

"Q. Did you hear that? A. It was about this valuation placed on the property and it was very satisfactory because of the fact that he had just appraised property. — I think this committee should know why I should remember the call to Joe Albert. The reason I recall it is that I knew of the bad feeling between Joe Albert and Mr. Moynihan. After these people had gone out, they had just gone out, when I stopped in he was then calling Joe Albert.

"Q. You mean Mr. Moynihan was calling Joe Albert? A. Yes, Joe Albert. I said, to be very frank, 'What the hell are you calling Joe Albert about anything for, knowing as you know what he thinks about you?' "

On cross-examination Mr. Thompson testified that Mr. Moynihan tried unsuccessfully to get Mr. Albert on the telephone before he called Mr. Crawford and that because of the fact that he had heard him call for Mr. Albert he listened to Mr. Moynihan's part of the conversation with Mr. Crawford. These purported telephone conversations occurred in March, 1934, and Mr. Thompson heard nothing further about them until January, 1937, when the complaint in this disbarment proceeding was served on Mr. Moynihan. He did not know of the submission of Mr. Moynihan's matter to the grand jury. In this connection, he thus testified:

"Q. This grand jury took place some time prior to that [Mr. Thompson's trip east, in July and August, 1936]. It was the twenty-fourth of April, 1936, when your partner appeared before the grand jury. A. He never told me. I haven't discussed it with him.

"Q. And that would be a rather important thing, a member of a firm taken up before the grand jury; that wasn't discussed? A. I am testifying that it wasn't. And I said to him, 'If that's what's been the trouble why didn't you say something about it?' That's what stuck in my mind when he handed me the formal charge."

In explaining why he had not given any further consideration to what occurred in Mr. Moynihan's office, Mr. Thompson said:

"It wasn't a major thing in my mind. For the further purpose of the record I would like to state I wasn't in the habit of eavesdropping or butting in on somebody else's business. It was just the name mentioned and the difficulty in the background that caused me to listen."

In connection with Mr. Thompson's overhearing the telephone conversation described, it is appropriate at this point to refer to the following finding of the trial committee:

"At the request of the accused, the trial committee went to the offices in question and two of its members, Messrs. Jack and Maguire, carried on a conversation under the same circumstances as related by the witness Thompson. Another member of the trial committee, Mr. McMahon, was in Thompson's office, the doors of both offices being open. The member of the trial committee in Mr. Thompson's office could not hear the conversation carried on by Mr. Jack and Mr. Maguire or hear Mr. Jack attempt to place a telephone call. * * * The trial committee are of the opinion that it is most improbable that Mr. Thompson in his office could have heard any conversation carried on over the telephone by the accused in his own private office even with the doors of both offices open."

The trial committee was comprised of three members of the Oregon bar with extensive experience as trial lawyers. They had the advantage of seeing and hearing the witnesses. They also inspected the office of the accused. The testimony in this proceeding was taken April 8, 1937. Thereafter, comprehensive briefs were filed by attorneys representing Oregon State Bar and Mr. Moynihan. There was some delay in getting out the transcript. It was not until February 7, 1938, that the trial committee made its report to the Board of Governors of Oregon State Bar. Thereafter exceptions were filed by the accused with the Board of Governors, accompanied by a brief.

The trial committee unanimously found that the "evidence clearly establishes that the Ostranders were not present on the occasion when the Smiths and" Mrs. Briedwell were in Mr. Moynihan's office. That committee also made the following finding:

"The trial committee are clearly of the opinion, and so find, that the accused did not have any such conversation with Henry Crawford over the telephone such as he testified before the circuit court of Marion county and repeated in his affidavit, and they are firmly convinced and so find that he had no such conversation with Joseph Albert."

The committee found further that the testimony given by Mr. Moynihan in the foreclosure suit was untrue and false and that that part of his affidavit hereinabove quoted was likewise untrue and false, and stated:

"The committee then proceeded to consider whether or not in testifying falsely in open court and by affidavit the accused did so knowingly. It is aware of the fact that many honest witnesses are honestly mistaken in their testimony, but it is a strain upon credul-

ity to believe that the accused could have honestly thought that he had two conversations upon a matter of that importance,—alleged to have been had at the request of his clients, when no such conversation had taken place, particularly in view of the fact that his testimony was given and his affidavit made for the purpose of rebutting the claims of his former clients in another law suit involving a transaction wherein he was their legal representative. A vivid imagination, fired by a desire to aid a client, might break down the barrier separating memory and imagination, but it can hardly account for such a situation, when the attorney testifies falsely against the interest of a former client.

"The trial committee finds that in so testifying and in so averring the accused not only testified and averred falsely and untruthfully, but that in so doing he acted knowingly and intentionally with intent to mislead and deceive the court."

All eight members of the Board of Governors who heard the matter, after having "fully considered the record and findings and recommendations of the trial committee," unanimously found the accused guilty as charged in both causes of complaint against him.

■ The trial committee that heard the witnesses "is better qualified to determine disputed questions of fact than we who read the cold, printed record", and while its determination "is not conclusive, it must, in the very nature of things, be entitled to respect." See *Homan v. Hirsch,* 106 Or. 98, 211 P. 795.

We concur in the findings of the trial committee hereinabove discussed. No one who reads the record can have any doubt that the Ostranders were not present in Mr. Moynihan's office at the time or under the circumstances claimed by the accused. The only corroboration of Mr. Moynihan's testimony that they

were present is found in the testimony of Mr. Thompson, which is not in the least convincing.

The witnesses were excluded from the hearing while not testifying. That probably explains the discrepancy in some of the statements of Mr. and Mrs. Smith. Their testimony that it was at the instance of Mrs. Briedwell that Mr. Moynihan made telephone calls is shown by the record to be incorrect.

It is argued by Mr. Moynihan's counsel that Mr. and Mrs. Ostrander were interested witnesses, and that therefore their testimony should be discounted. They were undoubtedly prejudiced against their former attorney by his conduct in testifying against them. If they were biased, it is possible also that Mr. and Mrs. Smith had a special interest in the outcome of the trial before the committee. They were concerned lest the testimony given by one of their witnesses in the foreclosure suit be discredited.

Mrs. Briedwell, Mr. Crawford and Mr. Albert were entirely disinterested witnesses. They all showed utmost fairness in their testimony. Mrs. Briedwell did not go to Mr. Moynihan's office to ascertain whether the value of the property was sufficient security for a $2,000 mortgage. She is positive that neither Mr. Crawford nor Mr. Albert was called at her suggestion. Had any discussion of the value of the property been had while she was present, as testified to by Mr. and Mrs. Smith, she would certainly have remembered it. The testimony of both Mr. Crawford and Mr. Albert is most convincing that those two men did not state to Mr. Moynihan any estimate of the value of the property as by him claimed.

There were introduced in evidence a transcript of the testimony given by Mr. Moynihan in the foreclosure

proceeding and a copy of the pleadings in that case. It appears from the verification of the complaint that it was sworn to by Don C. Smith, one of the plaintiffs, before Mr. Moynihan. Mr. Moynihan was questioned in the court proceeding about the making of the verification before him, and stated that he did not remember that it had been so made. He had no recollection, he said, of that fact, and he could not explain why Mr. Smith came to him to swear to the complaint, when the office of the attorney representing the Smiths in that suit was in a different building, a block away from the office of Mr. Moynihan.

The complaint in the foreclosure proceeding is in the ordinary form for foreclosure of a mortgage. To this complaint an answer was filed which set up as a partial defense that the mortgage was one for purchase money; also that there was no consideration for the note and mortgage; and as another defense, in the nature of a counter-claim, that the plaintiffs, the Smiths, falsely and fraudulently represented to the Ostranders that the house on the five-acre tract was in good condition and that there were valid and subsisting building restrictions affecting that and adjoining properties. The pleadings in that suit did not contain any allegations as to misrepresentations made by the Smiths concerning the value of the property, except as the value might be referable to the condition of the buildings.

At the time Mr. Moynihan gave his testimony hereinabove quoted, in the foreclosure proceeding, he was not being questioned as to the matters concerning which he testified. He had been asked by attorneys for the plaintiffs concerning changes made in the mortgage and who were present when the changes were discussed.

This remark was then addressed to him: "I take it that change [as to amount and time of payments] was agreeable to every one", and he responded, "Oh, yes." An objection was made and overruled, and he proceeded to testify as hereinabove quoted. There does not appear in the record in the circuit court, which has been introduced in this matter, anything that called forth Mr. Moynihan's statements about obtaining opinions as to the value of the property. He introduced that subject and enlarged upon it.

■ There is grave question whether the testimony given by Mr. Moynihan comes within the statutory definition of perjury: § 23-601 O. C. L. A. That testimony does not appear to have been material to any of the issues framed by the pleadings in the foreclosure suit. One of the elements of the offense of perjury is that the statements made under oath were material to the inquiry: *State v. Walton*, 53 Or. 557, 99 P. 431, 101 P. 389, 102 P. 173.

The accused was, however, guilty of false swearing: 21 R. C. L., Perjury, § 2, page 255. And although false swearing did not, at the time his testimony was given, constitute a crime in this jurisdiction, it nevertheless has always been considered reprehensible. "Of all possible acts, few are so antagonistic to the business of judicial administration as the intentional false swearing which seeks to baffle the search for truth, without which justice is impossible. Such swearing is a flagrant insult to the dignity of the court": *In re Ulmer*, 208 F. 461, quoting from Chamberlyne, Modern Law of Evidence, § 249.

The statute provides that an attorney may be disbarred by the supreme court whenever it shall appear to that court that his conduct has been such that if he

were then applying for admission to the bar his application should be denied: § 47-502, O. C. L. A.

The court of appeals of New York in the case of *In re John Percy*, 36 N. Y. 651, in referring to the disbarment of an attorney who had ceased to possess a moral character, observed:

"It has been seen that the right of admission to practice is made, both by the constitution and statute, to depend upon the possession of a good moral character, joined with the requisite learning and ability. It is equally important that this character should be preserved after admission, while in the practice of the profession, as that it should exist at the time. It would be an anomaly in the law to make good moral character a prerequisite to an office of a life tenure, while no provision for removal is made in case such character is wholly lost. * * * When there can be no reliance upon the word or oath of a party, he is, manifestly, disqualified, and, when such fact satisfactorily appears, the court not only have the power, but it is their duty to strike the party from the roll of attorneys."

It is apparent that if Mr. Moynihan were now a candidate for admission to practice law, the record of his false swearing, here before us, would preclude his admission.

▇▇ The Board of Governors has recommended that Mr. Moynihan be suspended from the practice of law for a period of three years. The proceedings against him were, as above stated, instituted January 21, 1937, and the decision and recommendation of the Board of Governors were not filed in this court until April 26, 1940. In view of the long time this matter has been pending, and in the absence of any other professional misconduct on the part of Mr. Moynihan shown in the record, we believe that his suspension for three years will ac-

complish the purpose of proceedings of this character, namely, "not . . . to punish the accused attorney, as in matters of criminal cognizance, but . . . as 'necessary for the protection of the court, the proper administration of justice, and the dignity and purity of the profession, and for the public good and the protection of clients' ": *Ex parte Finn*, 32 Or. 519, 52 P. 756, 67 Am. St. Rep. 550.

It is therefore ordered that M. Clifford Moynihan be suspended from the practice of law for three years.