Argued March 14, accused suspended June 27, petition for
rehearing denied September 4, 1974

IN RE COMPLAINT AS TO THE CONDUCT OF

REUBEN G. LENSKE, *Accused.*

523 P2d 1262

148

*Reuben G. Lenske,* Portland, argued the cause in propria persona and filed briefs.

*William B. Crow* and *James A. Larpenteur, Jr.,* Portland, argued the cause and filed the brief for the Oregon State Bar.

PER CURIAM.

Accused suspended for two years.

This is a disciplinary proceeding brought by the Oregon State Bar against the accused. The complaint alleges that in an action in the state circuit court the accused testified that he and his wife were the owners of certain real property and that this sworn testimony was contrary to testimony he had given in a previous criminal action against him in the United States District Court, in which he had testified that his brother-in-law was the owner of such property.[1] The bar alleges that one or the other sworn statement was untrue and was intended to mislead the court.[2]

---

[1] See Marx v. Lenske, 268 Or 173, 519 P2d 1036 (1974), and Lenske v. United States, 383 F2d 20 (9th Cir 1967).

[2] The pertinent allegations of the complaint are as follows:

"III

"During the course of proceedings brought in the Circuit Court of the State of Oregon for the County of Multnomah entitled *William H. Marx, Plaintiff, vs. Reuben G. Lenske, et al, Defendants,* No. 333-466, which case involved,

The issues arising from the complaint and defendant's answer were heard by a trial committee of attorneys which found the accused guilty and recommended that he be suspended from the practice of law for two years. Those findings and recommendations were approved and adopted by the Board of Governors of the Oregon State Bar as recommendations to this court. The accused has petitioned for a reversal of those findings and recommendations.

In support of that petition (and as also alleged in his answer as affirmative defenses) it is contended by the accused: (1) that he was denied equal protection of the laws in that he was not given an opportunity to deny or explain the charges before the complaint was filed, as is the "normal and usual method of procedure," but was "singled out for prosecution";

among other things, the ownership of certain real property situated in Multnomah County, Oregon, the accused testified under oath that he and his wife had owned those certain parcels of real property continuously since 1936. This sworn testimony was contrary to testimony given by the accused in the United States District Court for the District of Oregon in the case entitled *United States of America, Plaintiff, vs. Reuben G. Lenske, Defendant,* No. C-19459, where he testified under oath that he was not the owner of the real property in question. He further testified under oath in the Multnomah County proceedings that the testimony he had given in the United States District Court was untrue. Said sworn testimony given in separate proceedings were inconsistent, and one or the other sworn statements given by the accused was untrue and was designed and intentially conceived by the accused to mislead and misrepresent to the court matters and things in controversy.

"IV

"The aforesaid conduct of the accused was and is unethical, unlawful and in violation of the standards of professional conduct established by law and by the Oregon State Bar, and was and is conduct such that if the accused were now applying for admission to the Oregon State Bar his application should be denied."

(2) that he was denied due process in that the complaint "fails to specify the alleged false statements of accused or give or allege the time and place or materiality of the alleged testimony"; (3) that "The Statute of Limitations and/or laches has run against the alleged misconduct"; (4) that it appears from the complaint that the accused was acting as an individual and "was not acting in the capacity of a lawyer" and "there is no allegation that accused was convicted of a crime".; (5) that the Board of Governors was "elected by undemocratic process" in violation of the Fourteenth Amendment to the United States Constitution, with the result that these disciplinary proceedings are invalid; and (6) that "The proceeding herein against accused is quasi-criminal and accused should not have to make an explanation of alternative charges against him and it is wrongful and a violation of due process to require accused to be subjected to the burden of defending himself herein."

In advance of the trial the accused also filed a peremptory challenge to the original chairman of the trial committee. That motion was granted. However, a subsequent attempt to challenge for cause another member of the trial committee was denied. A motion for leave to submit written questions to members of the trial committee, "as on voir dire," was also denied.

A motion was also made to this court to disqualify each member of this court for prejudice and was denied. This court also denied a motion by the accused that the entire file in a previous disciplinary case against him be made a part of the record.

Before discussing the questions raised by these various contentions the facts should be summarized.

*Summary of the facts.*

1. *The original deeds.*

On January 13, 1936, a "trustee's deed" was executed by C. W. Ingram, as trustee in bankruptcy, conveying to H. J. Mirviss certain real property in Multnomah County. That deed was recorded on January 13, 1936. On February 25, 1937, H. J. Mirviss and his wife executed a warranty deed to Rose M. Lenske, the wife of Mr. Lenske, conveying the same property to her. That deed was not recorded, however, until August 11, 1969. It does not appear from the record in these proceedings whether this was after the death of Mr. Mirviss. It does appear, however, that Mr. Mirviss was dead at the time of the second trial in the state court.

2. *Testimony and position taken by Lenske in 1963 in federal tax trial.*

In 1963 Mr. Lenske was tried in the United States District Court upon charges by the Internal Revenue Service that he had attempted to evade income taxes due for 1955, 1957 and 1958 and had made a false return for 1956. His conviction by the trial court was reversed upon appeal. *Lenske v. United States,* 383 F2d 20 (9th Cir 1967). The case was tried on a "net worth" theory. This property was one of a large number of properties claimed by the government to be owned by Mr. Lenske.

In that trial Mr. Lenske testified that in 1935 he had made "an investment for my brother-in-law," Mr. Mirviss, who lived in California, and that he had "negotiated a purchase for my brother-in-law" of the land in question; that title to the land was taken "in the name of the purchaser, my brother-in-law," and

was never changed from that time until "the present" (1963).

Later in the same trial, on cross-examination by the government attorney, Mr. Lenske testified as follows:

"Q. Now, sir, I believe you testified that back in the 30's you purchased a piece of timber property in Mr. Merviss' name.

"A. I purchased a piece of property for him.

"Q. Did Mr. Merviss give you the money?

"A. Yes."

The brief filed in the trial court by Mr. Lenske in that case stated as "the defense position" with reference to the "Mirviss timber transaction" that:

"The property was purchased in 1935 by Mirviss, and Mirviss owned the property then and has owned it ever since. * * *"

3. *Testimony in 1971 in trial of Marx v. Lenske.*

a. *By deposition.*

In the subsequent action against Mr. Lenske in the state circuit court the question arose whether or not this same real property was or was not owned by him. In a deposition taken in advance of trial, Mr. Lenske first objected to answering questions on this subject, claiming that such questions violated his constitutional rights, including his rights under the Fifth Amendment to the United States Constitution. Upon being required by the trial court to answer such questions, he testified that:

"It was bought for my wife in the first place. * * *"

He also testified that the reason why the title was taken in Mirviss' name was that "It was bought

on a competitive bid. I had reason at the time to believe that the bid would more apt to be successful if it was not in my own name."

He also testified that it was "the intention" that "it was his wife's property" when it was originally purchased and that he claimed ownership of the property at all times "until sometime when my brother-in-law was questioned [by the IRS] regarding — on the question of ownership. * * *" Mr. Lenske testified that at that time "I took the same position that my brother-in-law did" and that "he said it was his, and I concurred in that" and that Lenske "acquiesced in his assertion that he owned the property."

He also said that he did not tell his brother-in-law that he in fact owned the property and had always owned it, but acquiesced in that statement by his brother-in-law "in view of the fact that it was unrecorded and still stayed in his name, * * * it might be part of his assets instead of mine or my wife's."

In response to a question whether that "was a true fact," Mr. Lenske testified that:

> "It was purchased for my wife and belonged to my wife all the time. It was handled as ours, hers and my property."

He also testified that the IRS had previously tried to include this property in his "net worth." In response to a question as to why he didn't include it in his "net worth statement" at that time Lenske said that:

> "Because my brother-in-law got the idea as long as the property was still recorded in his name and that I had not recorded the deed from him, that he could consistently claim for them that it was his."

b. *On trial.*

On trial of this second case, Mr. Lenske admitted that in the tax trial he had testified that title to the property was vested in his brother-in-law. When asked whether that was "false testimony" he answered:

"Well, let me put it this way: I was incorrect when I said that."

He went on to say that he had been mistaken "because it is interpretation of my previous testimony I think" and that "the theory I adopted at the time was that it was for my tax net worth purposes, tax purposes, it was his, and for any other purposes it was my family's."

In his brief in that case Mr. Lenske made the following statement:

"The evidence on these parcels is so clear and conclusive that I shall not belabor that issue much. The only thread on which to hang their needle on these parcels is my testimony in my tax prosecution case. That testimony must be looked at in the light of the task I was facing. The Internal Revenue Service used all manner of unlawful procedure to get me. They tapped my phone, they stole my records, etc. etc. I was using every avenue of escape from unlawful prosecution that seemed available to me. My brother-in-law and I both contended that for the purposes of the tax case against me the property, on record in his name, was his. Between us this was solely for that tax purpose and none other. Condemn me if you will for taking that position but place yourself in my position and then see if you would not take advantage of any opening available to avoid the awsome result of a wrongful prosecution against you. * * *"

After considering the testimony and contentions by Mr. Lenske, among other things, the trial judge held

that he did in fact own the property, rather than the estate of Mr. Mirviss. The trial judge also testified in the present proceeding that during that trial Mr. Lenske did not give any false testimony. Because, however, of the evidence that Mr. Lenske had given contradicting testimony during the previous federal tax trial, the trial judge referred the matter to the Oregon State Bar for its consideration. These proceedings were then instituted.

4. *Testimony and position taken by the accused in these proceedings.*

At the hearing before the trial committee Mr. Lenske was asked whether he had testified in the tax case that this property "did in fact belong to Mr. Mirviss and not to you." His response was that "[W]hatever I testified to I testified to, and I'm not going to try by memory to specifically say that I testified to one thing or another." He said, however, that "It was my intention to lead the court to believe that whatever I said was correct and in my opinion, as for the time and for the purposes involved, whatever I said * * * was correct." When asked whether he thought that "you can own property for all purposes except for tax purposes but not for tax purposes," he replied: "I don't know, I had that impression that it could be done. * * *"

When Mr. Lenske was asked "what your testimony is now?" he answered, "Well, I can't tell you. The only thing that I could do would be to say — I can't say at this time that I said anything different than what the record shows." Mr. Lenske testified, however, that he had been the "initiator in the purchase of the property" in that "he saw the substantial potential";

that he "doesn't know where the money came from, whether it came from money that he produced or whether it came from money that my wife had saved up during the time that she was a kindergarten teacher or whether it came from some other source"; and that:

"* * * [M]y relationship with my brother-in-law was such that we could and sometimes did by word say it's yours, it's mine, it's yours, it's mine. Not merely for tax purposes, but for other purposes. And if it were his and I wanted it, he would give it to me. If it were mine and he wanted it, I would give it to him. That's the kind of relationship that we had. And, therefore, there was nothing wrong in the testimony that I gave at that time, whatever inconsistencies there may be with later testimony. I could have been right both times."

A member of the trial committee asked Mr. Lenske whether he could "harmonize" his testimony in the two trials. Mr. Lenske's answer was that the tax trial lasted about three months; that he had a lawyer to help him only during the last two weeks and had been completely on his own during the first two and one-half months of the trial and that although the brief went "under his name" the attorney "figured out some theory, I don't know what it is yet, under which * * * he figured out some theory under which he could even get a reduction of my net worth."

In final argument to the trial committee Mr. Lenske said that the bar put him in "an impossible position with this complaint." He went on to say:

"But if you will give consideration to the testimony as to the relationship of my brother-in-law and myself, anyone of the answers that might seem inconsistent between 1963 and 1965 or '70, it could have been correct."

and that:

> "* * * [W]hatever he and I agreed between ourselves, even if our motive was to save taxes or to save me from tax trouble whatever he and I agreed, that was it and was valid."

He went on to state that:

> "I had a right to put what would appear to be my best foot forward for myself * * *."

In his brief to the trial committee he stated:

> "Whatever I said when I said it I believed to be true. * * * Moreover there is nothing wrong in the existence of a relationship between a brother and a sister having a relationship of trust with each other so that whatever they agreed with each other from time to time was true. The world is full of mistrust as is evidenced in Washington today, and justifiably so. It should be refreshing to see a close relationship between some people where trust is merited, * * *."

*The motions, affirmative defenses and objections by the accused.*

1. *The alternative allegations of the complaint.*

The principal contention raised by the motions, affirmative defenses and objections by the accused is that the complaint is improper and insufficient in that it alleges, in the alternative, that the accused gave false testimony in either the federal tax trial or in the subsequent state court trial, but does not inform the accused which testimony is charged as being false.

The accused is correct in his contention that if this were a criminal action for perjury, the established rule at common law is that such an action cannot be based upon such alternative allegations. The accused may also be correct in his contention that a disbarment

proceeding against a lawyer is a quasi-criminal proceeding to the extent that it may result in a punishment or penalty imposed on the lawyer, with the further result that the accused is entitled to demand that his constitutional rights be respected in such proceedings. *Re Ruffalo,* 390 US 544, 550-551, 88 S Ct 1222, 20 L ed 2d 117 (1968). See also *In re J. Kelly Farris,* 229 Or 209, 214, 367 P2d 387 (1961). It does not follow, however, that either this complaint or these proceedings were fatally defective.

■ Because the primary issue in bar disciplinary proceedings is not whether the accused attorney has committed a crime, but his fitness to practice law, the outcome does not turn upon technical definitions of statutory or common law crimes. See *In re Paul F. Gronnert,* 242 Or 233, 236, 391 P2d 772 (1965). However, as pointed out by Justice White, concurring in *Ruffalo, supra* at 390 US 555:

"* * * [M]embers of a bar can be assumed to know that certain kinds of conduct, generally condemned by responsible men, will be grounds for disbarment. This class of conduct certainly includes the criminal offenses traditionally known as malum in se. It also includes conduct which all responsible attorneys would recognize as improper for a member of the profession."

■ It follows that the allegations of a complaint in a disciplinary proceeding against an attorney need "not conform to the strict technical requirements of an indictment" for perjury and that "the court will look to the substance of the charge rather than the technical accuracy with which it is presented." *State v. Woerndle,* 109 Or 461, 469, 209 P 604, 220 P 744 (1923). In that case the accused made a false statement under oath in an application for a passport. In holding that the

accused should be suspended from the practice of law for six months because of that false statement, despite the fact that it was not made by the accused as an attorney or in testimony before a court, this court said (at 476), in characterizing the "substance of that charge":

> "Do trustworthy lawyers make false oaths?
>
> That question must be answered in the negative."

Similarly, this court has held that in a disciplinary proceeding against an attorney for giving false testimony proof that such testimony was material to the issues of the case is not required, although required in an indictment for perjury. *In re Moynihan,* 166 Or 200, 111 P2d 96 (1941), in suspending that attorney for three years this court said (at 224):

> "* * * [A]lthough false swearing did not, at the time his testimony was given, constitute a crime in this jurisdiction, it nevertheless has always been considered reprehensible. 'Of all possible acts, few are so antagonistic to the business of judicial administration as the intentional false swearing which seeks to baffle the search for truth, without which justice is impossible. Such swearing is a flagrant insult to the dignity of the court': *In re Ulmer,* 208 F. 461, quoting from Chamberlyne, Modern Law of Evidence, § 249."

ORS 9.480 (1) provides that an attorney may be disbarred, suspended, or reprimanded by this court not only upon conviction for misdemeanors involving moral turpitude and for felonies, but also for conduct "of such nature that, if he were applying for admission to the bar, his application should be denied." ORS 9.220 (2) requires an applicant for admission as an attorney to show that he or she is "a person of good moral character."

As held in *Moynihan, supra* at 225, quoting with approval from *In re John Percy,* 36 NY 651 (1867):

" '* * * It would be an anomaly in the law to make good moral character a prerequisite to an office of a life tenure, while no provision for removal is made in case such character is wholly lost. * * * When there can be no reliance upon the word or oath of a party, he is, manifestly, disqualified, and, when such fact satisfactorily appears, the court[s] not only have the power, but it is their duty to strike the party from the roll of attorneys.' "

■ Thus, a complaint in a disciplinary proceeding against an attorney is sufficient if it alleges facts describing conduct of such a nature as to show that the accused is not a person of good moral character.⑨

As for the alternative allegations of this complaint, this court held in *Jones v. Howe-Thompson, Inc.,* 143 Or 337, 342-43, 22 P2d 502 (1933), although a civil case, that:

"Our rule of pleading (§ 1-604, Oregon Code

---

⑨ It should also be noted that ORS 9.460 (4) provides that an attorney shall

"Employ, for the purpose of maintaining the cases confided to him, such means only as are consistent with truth, and never seek to mislead the court or jury by any artifice or false statement of law or fact;"

An attorney who gives testimony as a party and who also acts as his own attorney must exercise extreme care to observe the duty imposed by ORS 9.460 (4) because of the difficulty in distinguishing between his conduct as a party-witness and his conduct as an attorney.

In this case, the complaint alleges that Mr. Lenske gave inconsistent testimony as a witness. It also alleges that such testimony was "designed and intentionally conceived to by the accused to mislead and misrepresent to the court matters and things in controversy." Although not involving the sufficiency of the complaint, it also appears from the evidence that Mr. Lenske not only gave inconsistent testimony as a witness, but that he took inconsistent positions as an attorney in the briefs submitted to the courts in the two cases.

1930) requires the pleader in the drafting of his pleading to make a 'plain and concise statement of the facts'. It says nothing about alternative language. Language which is alternative in form may not be sufficiently plain if the pleader plainly knows the truth, or should know it. But it occasionally must occur that after an accident has happened which has inflicted an injury upon one who now desires to sue, that he knows that the prospective defendant committed one or the other of two acts, and was negligent in either event, but is unable to determine with sufficient certainty which one so as to justify him in abandoning the one as a premise for his action and swearing to the other. *Under such circumstances, if disjunctive language will not unfairly inconvenience the defendant, the plaintiff may employ alternatives in his complaint.* \* \* \*" (Emphasis added)

Similarly, for the purposes of criminal prosecution for false swearing, an indictment in the federal courts may now allege that a defendant has knowingly made two material declarations under oath which are "inconsistent to the degree that one of them is necessarily false" without alleging which declaration was false.[①]

---

[①] 18 USCA § 1623 (c) provides:

"(c) An indictment or information for violation of this section alleging that, in any proceedings before or ancillary to any court or grand jury of the United States, the defendant under oath has knowingly made two or more declarations, which are inconsistent to the degree that one of them is necessarily false, need not specify which declaration is false if —

"(1) each declaration was material to the point in question, and

"(2) each declaration was made within the period of the statute of limitations for the offense charged under this section.

"In any prosecution under this section, the falsity of a declaration set forth in the indictment or information shall be established sufficient for conviction by proof that the defendant

■ For all these reasons, we hold that the complaint in this case was not fatally defective in any way which violated the constitutional rights of the accused. It is true that the complaint alleged that the accused gave false testimony in either the federal tax proceeding or in the subsequent state court proceeding, without alleging which testimony was false. This, however, is not a case in which "the pleader plainly knows the truth, or should know it," as stated in *Jones*. We cannot say in this case, either from the allegations of this complaint or from its nature and subject matter, that the Oregon State Bar either knew or should have known which of the two inconsistent statements was true and which was false.

Also, as in *Jones,* we do not believe that the alternative allegations in this complaint caused any "unfair inconvenience" to the accused. The two proceedings were identified, as well as the testimony which was alleged to be inconsistent. Although no legal description of the property was alleged, no contention is made by the accused that he was not fully aware of what property, as well as what testimony, was involved. His position, in essence, is that he was entitled as a matter of due process to know which testimony was alleged to be false. He demonstrated by his testimony, however, that he knew full well which testimony was true and which was what he called "incorrect." Under the circumstances of this case, we do not believe that any of the constitutional rights of the accused were

while under oath made irreconcilably contradictory declarations material to the point in question in any proceeding before or ancillary to any court or grand jury. It shall be a defense to an indictment or information made pursuant to the first sentence of this subsection that the defendant at the time he made each declaration believed the declaration was true."

violated by reason of the alternative allegations of this complaint.

We might agree that if, at the time each statement was made, the accused believed it to be true, and in good faith, such a belief would provide a defense to such a charge. Indeed, Mr. Lenske testified to that effect in this case. The issue raised by such a contention, however, is one of fact and does not go to the sufficiency of the complaint.[9]

2. *Other affirmative defenses and motions.*

We have also considered the other affirmative defenses and motions by the accused and find them to be without merit.

■■ The fact that the accused was not given an opportunity to explain the inconsistency prior to the filing of the complaint does not invalidate these proceedings. The accused was afforded a full opportunity to do so at the hearing before the trial committee. Neither does the failure to previously provide that opportunity establish that the accused "has been singled out for prosecution" by the Oregon State Bar or by its secretary. The fact that the Oregon State Bar may not have brought charges against some attorneys who have been found guilty of criminal violations, as also complained of by the accused, is also insufficient to establish that defense. In any event, we find no substance to that charge.

■ The materiality of the inconsistent statements need not be proved in such a proceeding. Cf. *In re*

---

[9] As noted below, however, the court has also considered this issue of fact and has found that at the time that Mr. Lenske testified in the federal tax proceeding he knew that testimony given by him in that proceeding was false.

*Moynihan, supra* at 224. See also ORS 162.075. The statute of limitations and laches are not defenses. *State v. Woerndle, supra* at 476, and *In re Philip Weinstein,* 254 Or 392, 459 P2d 548 (1969), *cert denied,* 398 US 903, 90 S Ct 1689, 26 L ed 2d 61 (1970).

It need not be proved that the misconduct involved actions by the accused in his capacity as an attorney or that he was convicted of a crime. As stated in *In re Otto W. Heider,* 217 Or 134, 159, 341 P2d 1107 (1959):

> "We may say we are not impressed with petitioner's assertion suggestive of a dual personality; the one a man of business and finance, the other, and apparently a secondary concept, a lawyer. How it may be argued that in the capacity of business man he may indulge in practices generally condemned with reference to attorney and client relationships, when the circumstances show such intimate relationship as to make the two practically inseparable, we do not know.
>
> "* * * Under the facts of this case there is no cleavage or separation of responsibility for petitioner's acts as a business man and as a lawyer. He may not employ and accept the benefits of such intermingling of activity involving both law and business without assuming responsibility for both. * * *"

See also *State v. Woerndle, supra* at 469-470.

The fact that the Board of Governors of the Oregon State Bar may have been selected by what is referred to by the accused as an "undemocratic process" does not invalidate these proceedings. ORS 9.540 provided that the Board of Governors may make *recommendations* to this court in disciplinary matters.[a] The findings and recommendations by trial committees

---

[a] ORS 9.540 has since been repealed.

appointed by the Board of Governors and by the Board of Governors itself are wholly advisory, although most helpful to the court. The responsibility for the disbarment of an attorney, however, rests solely with this court and it reviews the record in all such proceedings de novo.

The motion by the accused for leave to submit written questions to the members of the trial committee, as on voir dire, was properly denied. Such a trial committee is not a jury. Appropriate remedies are provided for both peremptory challenge and challenges for cause by Rules of Procedure § 26, promulgated pursuant to ORS 9.580. The peremptory challenge of one member was granted. The attempted challenge for cause of another member was properly denied. Although the accused may have filed a motion for leave to submit written questions within the time required for challenge by Section 26 he did not submit the challenge for cause within that time.

We also hold that the motion by the accused to disqualify each member of this court for prejudice has no basis either in law or in fact. The primary basis for that motion is that this court has on occasion ruled against the accused in various cases in which he has appeared. No mention is made of the cases in which this court has held in favor of the accused or his clients. It is also contended that members of this court are prejudiced because the Oregon State Bar has, on occasion, made and supported recommendations that the salaries of judges be increased. If this were true this court would also be disqualified from hearing any case involving the legislature or any of its members.

*The charges of misconduct were established by the evidence.*

The accused, in his testimony and briefs in these proceedings, would seek to avoid the charges of misconduct alleged in the complaint by admitting that his testimony as given during the federal tax trial was "incorrect," but by contending there was nothing improper in the giving of that testimony, considering all of the circumstances. Thus he has contended: (1) that the "idea" at the time of the tax trial that the property belonged to Mr. Mirviss was that of Mr. Mirviss, and the accused only "acquiesced in his assertion that he owned the property"; (2) that his attorney in the tax trial "figured out some theory, I don't know what it is yet"; (3) that "In each instance, whatever I said I thought was true"; (4) that there "is nothing wrong" with a "relationship" under which he and Mr. Mirviss might take the position that the property was "yours" or "mine," and "not merely for tax purposes, but for other purposes."

The fact, if true, that it was Mr. Mirviss who suggested the "idea" at the time of the tax trial that the property belonged to him, rather than to Mr. Lenske, does not excuse the giving of false testimony under oath. Neither does the fact, if true, that Mr. Lenske's attorney "figured out" some theory as a defense in the tax case.

In the course of the tax trial Mr. Lenske testified directly and without equivocation that "I purchased the property for him" (Mr. Mirviss) and that he gave Mr. Lenske "the money." Other testimony by Mr. Lenske during that trial and statements appearing in briefs submitted over his name in both the trial

court and on appeal were also to the clear effect that the property was purchased in 1935 by Mr. Lenske for Mr. Mirviss and that Mr. Mirviss had been its owner at all times since then.

In the subsequent trial in state court, however, Mr. Lenske testified, again directly and without equivocation, that "It was purchased for my wife and belonged to my wife all the time. It was handled as ours, hers and mine," and that the testimony given by him at the previous federal tax trial was "incorrect."

After an examination of the entire record, including the testimony and briefs submitted by Mr. Lenske in this and in both previous cases, we find that in so testifying at the time of the federal tax trial Mr. Lenske gave testimony that was false; that he knew full well at that time that such testimony was false, and that he gave such testimony deliberately and with the intention that the federal trial court should rely upon the truth of that testimony. We therefore reject the contention by Mr. Lenske that when he gave that testimony he "thought [that it] was true."

Finally, we must reject the bald assertion by Mr. Lenske that there was "nothing wrong" with a "relationship" under which he and Mr. Mirviss might, to suit their convenience, take the position that the property belonged to Mr. Lenske at one time and to Mr. Mirviss at another time, "not only for tax purposes or for other purposes." Any attorney who sees "nothing wrong" with such a "relationship," despite its inherent potentials for tax fraud and fraud on creditors, among other things, does not have the good moral character which is a necessary prerequisite to the practice of law. Cf. *In re Moynihan, supra* at 255.

It is said by Mr. Lenske that such a "relationship" of trust should be regarded as "refreshing" when "the world is full of mistrust as evidenced in Washington today," with obvious reference to the so-called "Watergate" affair.

On the contrary, one of the foremost lessons to be learned by lawyers from the "Watergate" affair is that when a lawyer is placed under oath to tell the truth he has the duty to do so regardless of his "relationship" with other persons, whether public officials or private clients, except to the extent that he must remain silent to protect the lawful privileges of his clients. Lawyers who have been able to see "nothing wrong" about equally amoral "relationships" and who have given "inconsistent" testimony under oath have no proper place in the practice of law as an honorable profession.

■ This is not the first occasion in which Mr. Lenske has been found guilty of professional misconduct. See *State ex rel Oregon State Bar v. Lenske,* 243 Or 477, 405 P2d 510, 407 P2d 250 (1965), cert denied, 384 US 943, 86 S Ct 1460, 16 L ed 2d 541, reh denied, 384 US 1028, 86 S Ct 1920, 16 L ed 2d 1047 (1966). Both the trial committee and the Board of Governors have recommended that the accused be suspended from the practice of law for two years. We approve and adopt that recommendation.