Argued and submitted April 8, application
denied May 6, petition for rehearing denied May 28, 1980

In the Matter of the Application of
**THOMAS D. EASTON,**
For Admission to Practice Law in the
State of Oregon.

(SC 26696)

610 P2d 270

Thomas Easton, applicant pro se, argued the cause and filed the briefs.

Marcus K. Ward, Eugene, argued the cause for the Oregon State Bar. With him on the brief was Richard E. Miller, Eugene.

Before Denecke, Chief Justice, and Howell, Lent, Peterson and Tanzer, Judges.

PER CURIAM.

## PER CURIAM.

Applicant seeks admission to the practice of law and the Oregon State Bar has filed objections thereto. A trial board conducted a hearing and recommended that the applicant be denied admission to the bar. A disciplinary review board also recommended denial.

This case comes under ORS 9.220, which requires:

> "An applicant for admission as attorney must apply to the Supreme Court and show that he or she:
>
> "* * * * *
>
> "(2) Is a person of good moral character, which may be proved by any evidence satisfactory to the court."

The objections to admission are in the form of allegations of specific acts by applicant which purportedly demonstrate lack of good moral character. Although the statute places the burden upon the applicant, the Oregon State Bar went forward and proved the various events upon which it relies.

The allegations all arise from the tumultuous break-up in 1978 of applicant's nine-and-one-half-year marriage and the resulting dissolution proceedings. Applicant was then a 43-year-old third-year law student. There are several allegations regarding false accusations made against lawyers and judges directly and peripherally involved in the proceedings, but we do not dwell on these allegations because there are two fundamental allegations which are dispositive. The underlying facts of the dispositive allegations are generally not disputed, although much of the hearing was concerned with applicant's motivation.

The first allegation is that the applicant took his three-and-one-half-year-old son to California in violation of an order awarding temporary custody to the mother. Over a period of time prior to taking the child, he researched the law and consulted others to determine in which states he would be able to obtain a custody order contrary to the custody order in

Oregon. He expressed interest in the state of Montana where he felt he could find employment in the woods and not be discovered. He thereafter took the child and, three weeks later, he was apprehended in California. Upon return to Oregon, he was convicted of custodial interference in the first degree under ORS 163.257, a felony, and was held in contempt by the domestic relations court.

The second dispositive allegation is of perjury. During the course of the dissolution proceedings, the applicant disposed of property which was to be distributed to his wife. When questioned as a witness, he admitted that he had given the property to friends. When asked the identity of the friends, he declined to answer on the ground that he did not wish to reveal their identity and subject them to difficulties. Upon being ordered to answer, he stated that he did not remember the identity of the friends to whom he had given possession of the property. In fact, he did remember.

■ These incidents of custodial interference and perjury demonstrate a lack of good moral character as that term relates to fitness to practice law. They both arise from deliberate decisions to violate criminal law and to disobey orders of court. The applicant attempts to morally justify his conduct: his custodial interference, he asserts, was out of love for his son; his perjury was to protect his friends from harassment. His justification, however, is simply an admission that the applicant believes it morally correct to obey a higher personal ethic than to conform his behavior to the law and to orders of court. Applicant's belief directly undermines his ability to represent and advise clients, particularly in situations of stress and emotional conflict. Moreover, it is directly inconsistent with a lawyer's function as an officer of the court. We do not hold that every act of disobedience of law automatically disqualifies one for the practice of law. Some unlawful acts are not of a nature or magnitude which reflect adversely on character traits which are deemed essential to the practice of law. We conclude that a lack

of good moral character under ORS 9.220(2) has been established.

■ Next, we address the subject of reformation. We recognized in *In re Jolles,* 235 Or 262, 383 P2d 388 (1963), that once an applicant has demonstrated a willingness to act in accordance with his personal convictions rather than with the law of the state, the next question is whether he has undergone a reformation of character between the time of such conduct and his application for admission to the bar. Here, we conclude that there has been no such reformation. Our conclusion is based upon the nature and circumstances of the offensive conduct and upon the applicant's attitude toward that conduct as expressed during this proceeding.

First, the conduct was that of a 43-year-old person, rather than a youngster in his formative years. We assume that the applicant, as a third-year law student, had been exposed to professional concepts of rule of law and legal ethics. We regard his conduct not as the isolated acts of a naive young person, but rather as the reaction of a generally unstable person faced with a stressful situation. By contrast, the conduct in *In re Jolles* reflected the applicant's intellectual conviction which was subject to reconsideration.

Moreover, applicant's conduct was deliberate rather than impulsive. The custodial interference was researched and planned over a period of time. The perjury occurred as a matter of conscious decision.

The most persuasive factor bearing on reformation is the applicant's lack of appreciation of the moral and legal implications of his conduct as reflected in his testimony before the trial board and in his argument before this court. Applicant has demonstrated that he continues unchanged in the moral rationalization he made at the time. He testified, "I have grown. But I have not changed my character."

Regarding custodial coercion, applicant testified that he is familiar with Oregon cases in which custody has been changed, but indicates that he would nevertheless again, in a similar situation, resort to self-help rather than adjudication. For example, he testified:

> "And our Oregon courts are full of cases, or there are numerous cases, where they have changed custody on what would appear to be less than really sound reasons. And the change of custody is harmful. I think it will be harmful for my son to be in my custody violently through my taking him again. That is what keeps me from doing it again. It's not fear of the law, or desire to be admitted to the Bar, that keeps me from taking him again. Because I don't fear that. I don't want to be admitted to the Bar so badly that if I felt my son was being mistreated and abused by my wife, ex-wife, I would not take him again. If I were informed and had reason to believe that she was doing something to him that was so harmful to him that a change of custody would be better for him than the evil she was doing, then I would take him.
>
> "* * * * *
>
> "So what keeps me from taking my son is not the law, but the higher ethic of what would be harmful or good for that child."

In his pro se brief, applicant states:

> "Applicant argues that his action in stealing his child out of the State of Oregon may be considered a moral rather than a bad moral action, even though illegal by the laws of Oregon. Applicant testified that he considered it 'forum-shopping,' a technique well known to all who have taken law courses in federal courts. * * *"

It is patently clear that the applicant still has no understanding of the legal or moral implications of his extra-legal conduct.

At the hearing, the applicant's attitude toward possible repetition of his perjury was inconsistent. His testimony explaining why he would not again prevaricate in a similar situation lacks the ring of profound conviction:

"The question is how would I act in the future under a similar circumstance. If I were admitted to the Bar, or even if I weren't admitted to the Bar. Suppose I am in court again and that same problem is posed to me. I think that's the important problem. And I've had to think over that answer that I would give a long time. Because my first impulse is to say that I would do the same. I would always prefer loyalty above an order of a court.

"And yet, the more I think about it, the more I realize that perhaps the answer lies in the advice given to the attorney in New York, who when asked by the parents of a missing woman, said nothing when they asked if he knew anything. Yet he knew her body, dismembered body, was in the bottom of a well, because his client had admitted that to him. And I think the Bar ethic committee's advice to him was he should have gone to a judge and asked his opinion as to what to do, laid out the facts, his information, and the request from the parents, and asked his opinion. I'm not perfectly comfortable with that. Because that is, I think, passing the buck. But I think I could learn to pass the buck, also. Knowing that if you pass the buck and the buck comes back with an order to go ahead and give the names, then you're going to have to give the names. I think I could act like that in the future. I would hope so."

Applicant still fails to understand the moral quality of his perjury. He testified:

"Q. Well, okay. In the divorce trial then —. At the dissolution trial that you did in fact tell Judge Rodman that you didn't remember things that you in fact did remember?

"A. Yes.

"Q. Okay.

"A. I didn't want you to infer I say I lied, or told an untruth in a sense of affirmative lie. And I don't think it was perjury. But I certainly failed — said I failed to recall, when I could have recalled. And Judge Rodman was accurate when he testified that I withheld the names of these people. That was the recollection I failed to recall.

"Q. Okay. Well, you're not telling us that you didn't know the names of those people, are you?

"A. No. I'm telling you that I withheld that to protect them, as he recounted.

"Q. So when you said you didn't remember who they were, you were in fact lying, were you not?

"A. I don't think that's in fact lying."

Finally, in his argument to the trial board, the applicant contradicted his testimony and acknowledged that nothing has changed:

"[Testifying against one's former friend is] a moral choice. And once one makes a moral choice like that, one has to face the consequences. It may be imprisonment, it may be humiliation, loss of reputation, it may be this. Being denied admission to the Bar. But if I had it to do over again, I was in the same position in front of Judge Rodman, I would have to answer him as I did then, I will not recall who the names are."

We are mindful of the evidence given by people whose opinions we respect that applicant is possessed of good moral character suitable for the practice of law. We are also mindful that applicant has many excellent qualities to commend him. We conclude nevertheless that the positive evidence is overcome by evidence of applicant's conduct as well as his testimony and professions during the course of this proceeding.

Application denied.