Argued and submitted February 9, application denied June 29, 1982

In the Matter of the Application of
# RONALD CURTIS TAYLOR,
For Admission to Practice Law in the
State of Oregon.

(OSB 89-AD, SC 27292)

647 P2d 462

William B. Wyllie, Salem, filed a brief for applicant.

Gary E. Rhoades, Portland, argued the cause for the Oregon State Bar. With him on the brief was Albert A. Menashe, Portland.

PER CURIAM.

## PER CURIAM

Applicant requests admission to the Oregon State Bar. He passed the Bar examination in the summer of 1980, but was not recommended for admission by the Board of Bar Examiners. On his petition for review, a hearing was held before a trial board pursuant to the Rules for Admission of Attorneys. The trial board recommended that applicant be denied admission to the Bar and, with one modification, this recommendation was adopted by the Disciplinary Review Board. Applicant then requested review by this court. ORS 9.535.

This case comes under ORS 9.220, which, at the time these proceedings began,[1] required:

"An applicant for admission as attorney must apply to the Supreme Court and show that he or she:

"* * * * *

"(2) Is a person of good moral character, which may be proved by any evidence satisfactory to the court."

The objections to applicant's admission are in the form of allegations of specific acts by applicant which purportedly demonstrate a lack of good moral character. Though the statute places on the applicant the burden of proving his good moral character, the Oregon State Bar went forward and proved the various facts on which it relies. *Cf. In re Easton,* 289 Or 99, 101, 610 P2d 270 (1980), *cert denied* 449 US 862, 101 S Ct 166, 66 LEd 2d 79 (1980).

---

[1] Oregon Laws 1981, Chapter 193, Section 7 amended ORS 9.220. That section now reads:

"An applicant for admission as attorney must apply to the Supreme Court and show that the applicant:

"* * * * *

"(2)(a) Is a person of good moral character.

"(b) For purposes of this section and ORS 9.025, 9.070, 9.110, 9.130, 9.210, 9.250, 9.480 and 9.595, 'good moral character' means conduct not restricted to those acts that reflect moral turpitude, but rather extending to acts and conduct which would cause a reasonable person to have substantial doubts about the individual's honesty, fairness and respect for the rights of others and for the laws of the state and the nation. The conduct in question should be rationally connected to the applicant's fitness to practice law."

No one in these proceedings contends that this new language changes the substantive requirements for admission to the bar, and we express no opinion on this question.

We cannot overstate the necessity that one who seeks admission to the Bar be of good moral character. An applicant must possess this character in addition to intellectual abilities, and intellect alone cannot make up for deficiency of moral character.[2] In our opinions in cases of this kind, we have sought to stress this aspect of joining the profession, but the unfortunate fact is that these opinions are probably read only by the applicant involved and persons already admitted to practice. The person entering law school, for whom the process of admission to the organized Bar is several years down the road, is the very person to whom statements of this kind are addressed and by whom they should be read.

This applicant's want of the requisite good moral character appears from his theft, perjury and bankruptcy.

## THEFT

In 1977, while he was a first-semester law student, applicant was arrested at a Salem department store and charged with the theft of a shirt. Applicant was tried and at the close of the evidence the case was taken under advisement. Some time later, the charge against applicant was dismissed. In reviewing this application, the Disciplinary Review Board decided that applicant's arrest was not a valid objection to applicant's admission. In making this decision, the Board apparently focused on the fact that the case ended in dismissal.

■    Applicant contends that the dismissal of the charge forecloses any further consideration of the incident against

---

[2]

"One does not have to inhale the self-adulatory bombast of after-dinner speeches to affirm that all the interests of man that are comprised under the constitutional guarantees given to 'life, liberty, and property' are in the professional keeping of lawyers. * * * From a profession charged with such responsibilities there must be exacted those qualities of truth-speaking, of a high sense of honor, of granite discretion, of the strictest observance of fiduciary responsibility, that have, throughout the centuries, been compendiously described as 'moral character.' "

*Schware v. Board of Bar Examiners,* 353 US 232, 247, 77 S Ct 752, 760-61, 1 LEd 2d 796, 806 (1957) (Frankfurter, J. concurring). Many other courts have, in like manner, stressed that good moral character is a prerequisite to admission to the practice of law. *See, e.g., Matter of Keenan,* 314 Mass 544, 50 NE2d 785 (1943); *In re Farmer,* 191 NC 235, 131 S E 661 (1926); *In re Law Examination of 1926,* 191 Wis 359, 210 NW 710 (1926).

him. Of course, an arrest or a charge ending in dismissal does not establish that the accused committed the prohibited act. 3A J Wigmore, Evidence § 980a (Chadbourne rev. 1970). As the United States Supreme Court has said:

> "The mere fact that a man has been arrested has very little, if any, probative value in showing that he has engaged in any misconduct. An arrest shows nothing more than that someone probably suspected the person apprehended of an offense."

*Schware v. Board of Bar Examiners,* 353 US 232, 241, 77 S Ct 752, 757, 1 LEd 2d 796, 803 (1957). On the other hand, dismissal does not preclude inquiry to ascertain whether an offense was committed. We recently considered a similar question in a proceeding concerning the conduct of a judge, *In re Roth,* 293 Or 179, 645 P2d 1064 (1982). There, criminal charges had been filed and later dismissed. The judge argued that the dismissal precluded our consideration of the charges. We rejected this contention, concluding that it was our duty to determine whether or not the accused had violated the law, regardless of whether criminal charges had been filed.

> "Had no criminal prosecution ever been instituted in connection with the judge's conduct brought to our attention by this record, we should still inquire whether he failed to comply with the criminal law."

293 Or 179, 188, 645 P2d 1064, 1070 (1982).

Similarly, in this case, the trial court's dismissal of the charges in no way bars our examination of the underlying events.

> "[A]cquittal in a criminal action cannot be deemed to be *res judicata* here upon any issue, for the purpose and scope of an inquiry to determine an applicant's character and fitness to become a member of the Bar are essentially different. * * * Conduct not descending to the level of guilt of the violation of a criminal statute may well present an insuperable obstacle to admission to the Bar if such conduct evinces a lack of that 'character and general fitness requisite for an attorney and counselor-at-law.' "

*Application of Cassidy,* 268 App Div 282, 287, 51 NYS2d 202, 206 (1944) [citations omitted], *adhered to* 270 App Div

1046, 63 NYS2d 840 (1946), *aff'd* 296 N Y 926, 73 NE2d 41 (1947).[3]

■     We have examined both the transcript of applicant's trial and applicant's admissions to the Board of Bar Examiners, and we find that the record establishes that applicant took the shirt from the Salem department store. He avoided conviction by testifying at his trial that he had not intended to steal the shirt, but had merely forgotten to pay for it. In June, 1980, applicant met with three members of the Board of Bar Examiners (described as "the small board"), and admitted to them that he had lied in his trial. Later, under oath before the full Board of Bar Examiners in July, 1980, applicant again admitted that this testimony was not true, that, in truth, he intended to steal the shirt. Applicant's admissions provide the element missing at the trial and establish that applicant committed theft in the second degree. ORS 164.045.

## PERJURY

The most serious allegation against applicant is that he committed perjury in his 1977 trial for theft. As indicated above, when applicant met with the small board in June, 1980, he told the board members that his testimony in the 1977 trial was not true. Subsequently, testifying under oath before the full Board of Bar Examiners, petitioner again admitted that he had not told the truth in his 1977 trial.

The giving of false testimony is rightly held in utter opprobrium by the legal system.

---

[3] *Accord, In re Schaeffer,* 273 Or 490, 541 P2d 1400 (1975): The Bar considered a variety of traffic citations and applicant's handling of these, even though there is no record that these resulted in convictions. *In re Lenske,* 269 Or 146, 158, 523 P2d 1262, 1267 (1974): The accused was an attorney who, in two trials, gave conflicting testimony. At least one account was not true. The court said that even if the testimony was not perjurious, the conduct was unethical. *Spears v. State Bar of California,* 211 Cal 183, 294 P 697 (1930): Various charges had been brought against the applicant and then dismissed. The court looked beyond the charges to the underlying conduct. *In re Stover,* 65 Cal App 622, 224 P 771 (1924): The applicant was a known "dice shark," had twice been arrested for cheating in dice games, and had had several other run-ins with the police, though none resulted in conviction. The court considered these facts in denying his admission. *Petition of Goldman,* 206 So 2d 643 (Fla 1968): The court looked to the circumstances which had led to an indictment against the applicant, even though the indictment was subsequently quashed. *In re Monaghan,* 122 Vt 199, 167 A2d 81 (1961): The court considered all charges that had been brought against applicant, regardless of the disposition of the charge.

"Do trustworthy lawyers make false oaths? That question must be answered in the negative."

*State ex rel Grievance Committee v. Woerndle,* 109 Or 461, 470 at 476, 209 P 604, 220 P 744 at 746 (1923).

"Of possible acts, few are so antagonistic to the objects of judicial administration as the intentional false swearing which seeks to baffle the search for truth, without which justice is impossible. Such swearing is a flagrant insult to the dignity of the court."

1 C Chamberlayne, Modern Law of Evidence § 249 at 304 (1911); *In re Lenske,* 269 Or 146, 158-59, 523 P2d 1262, 1267-68 (1974), *cert denied* 420 US 908, 95 S Ct 827, 42 LEd 2d 838 (1975); *In re Moynihan,* 166 Or 200, 111 P2d 96 (1941); *In re Ulmer,* 208 F 461 (N D Ohio 1913).

There has been much discussion in these proceedings as to whether or not applicant's statements were actually perjury. For the sake of clarity, we set forth the relevant portions of the transcript of the 1977 trial. In his unsworn opening statement, applicant said:

"Yes, Your Honor. The defense doesn't dispute the material facts as stated in the opening statements by the Prosecutor. Defense will show outward through a presentation of information that there is no intent ?? [sic] motion to commit a misdemeanor."

Later in the trial, testifying under oath as a witness in his own behalf, applicant gave the following sworn testimony:

"On the day of the incident, Your Honor, I was on my way to school and I looked at Meier & Frank under the bridge and looked at some of the shirts and decided to try them on because two of the shirts were made in Korea and I used to work at Meier & Frank and I am aware that some of the shirts are not cut for larger people and bought the shirt or rather I decided to wear the shirt and I took the price tag off and left the dressing room, hung one of the shirts up and there were several people in front of me checking out and then I got ready to pay for the shirt. I only paid for the one that I had, that I didn't have on and because I had forgotten I was absorbed in what I was thinking about and I totally forgot about it until I got outside I was thinking about getting out to my car that I had parked in the manager's parking spot on the mezzanine level at the store and was thinking about that and some of the things I had

to do at school because it was getting close to the end of the term and I got out on the mezzanine and just about the same time I was accosted by the store persons I thought about that I still had the shirt and I showed her the price tag and pulled out my wallet and told her I was going to buy it and the security person grabbed me by the arm and I became offended and in any case they were pretty deliberate in their efforts in that they wanted me to come back into the store so I went in and was asked what happened or was I going to pay for it something to that effect and then lots of information was taken and the police officer was called and I was arrested."

This testimony is obviously rambling and confused; we find it was an attempt to convince the judge that applicant had forgotten to pay for the shirt. Applicant's clear design was to deny an intent to commit theft. This testimony was material to the charge of theft. In his appearances before the small board and the Board of Bar Examiners, applicant admitted that this testimony was false. We find that these admitted facts establish by clear and convincing evidence that applicant committed perjury. ORS 162.065.

Arguing that his testimony is technically not perjury, applicant admits that he tried to mislead the trial court:

"[The testimony is] rambling, purposefully evasive, indefinite, non-committal, ambiguous, and sometimes incoherent, * * *. The applicant is intelligent, articulate, has graduated from law school, passed the Bar exam his first try, * * *. The applicant wanted to muddle and confuse the record with a long-winded statement saying nothing and succeeded in doing so."

(Petitioner's Memorandum of Points and Authorities in Support of Applicant's Admission to the Bar, 3-4.) This effort to mislead the trial court is conduct sufficient to warrant our unequivocal condemnation. It is convincing evidence that applicant's sense of ethics is wanting. It is that sense of ethics with which we must be concerned. *In re Alpert,* 269 Or 508, 514, 525 P2d 1042, 1045 (1974); *In re Lenske, supra.*

## BANKRUPTCY

By filing bankruptcy in 1975, applicant discharged some $2,400 in student loans with which he had financed his under-graduate education.

**3.** The fact that petitioner filed for bankruptcy, standing alone, is not a factor which we consider in determining his moral fitness. The bankruptcy statutes prevent a rule which would preclude applicant's admission to the Bar solely because he declared bankruptcy. However, an applicant's handling of financial affairs is regularly considered in determining moral fitness. *See, e.g., In re William Vann Cheek,* 246 Or 433, 425 P2d 763 (1967); *In re Connor,* 265 Ind 610, 358 NE2d 120 (1976); *In re O'Brien's Petition,* 79 Conn 46, 63 A 777 (1906). The bankruptcy statutes do not prohibit examination of the circumstances surrounding bankruptcy, as these circumstances illustrate an applicant's judgment in handling serious financial obligations.[4]

The Supreme Court of Minnesota recently considered the application for admission of a person who had discharged student loans in bankruptcy. After reviewing the legal considerations pertinent to the evaluation of such bankruptcies, the court said:

> "We hold that applicants who flagrantly disregard the rights of others and default on serious financial obligations, such as student loans, are lacking in good moral character if the default is neglectful, irresponsible, and cannot

---

[4] The legislative history of the Bankruptcy Act indicates that Congress intended to bar a *per se* rule which would make filing in bankruptcy an automatic bar to a license or similar grant. Congress did not intend to preclude examination of the circumstances surrounding bankruptcy.

"The prohibition does not extend so far as to prohibit examination of the *factors surrounding the bankruptcy,* the imposition of financial responsibility rules if they are not imposed only on former bankrupts, or the examination of prospective financial condition or managerial ability. The purpose of the section is to prevent automatic reaction against an individual for availing himself of the protection of the bankruptcy laws. * * * [I]n those cases where the causes of bankruptcy are intimately connected with the license, grant, or employment in question, an examination into the *circumstances surrounding the bankruptcy* will permit governmental units to pursue appropriate regulatory policies and take appropriate action without running afoul of bankruptcy policy." (Emphasis added)

HR Rep No 95-595, 95th Cong, 1st Sess at 165 (1977), reprinted in 5 US Code Cong & Admin News, 95th Cong, 2d Sess 5787, 5963, 6126 (1978).

be excused by a compelling hardship that is reasonably beyond the control of the applicant. Such hardship might include an unusual misfortune, a catastrophe, an over riding financial obligation, or unavoidable unemployment."

*In re Gahan,* 279 NW2d 826, 831 (Minn 1979). The Supreme Court of Florida formulated a similar standard in cases of two applicants who had discharged student loans in bankruptcy. *Florida Bd of Bar Examiners re Groot,* 365 So2d 164 (Fla 1978); *Florida Bd of Bar Examiners re GWL,* 364 So2d 454 (Fla 1978).

Examining the circumstances surrounding applicant's discharge of his student loans, we find no extraordinary hardship which would compel resort to bankruptcy. When he declared bankruptcy, applicant's current liabilities did exceed his current assets, but he acknowledged before the Board of Bar Examiners that he could have managed his debts, including his student loans, had he wished to do so. His own explanation of his resort to bankruptcy is that he felt that society owed him an education. At the time, applicant was employed in a steady position, with a gross annual income of approximately $10,000. He faced no catastrophe or unusual misfortune. Further, he made no effort to adjust, extend, or renegotiate his student loans. On the other hand, he reaffirmed several other debts, those on which his creditors held security over property which he wished to retain.

Applicant had a legal right to discharge his student loans in bankruptcy as he did, and our decision herein is not based on his exercise of that right. The circumstances of his bankruptcy, however, show a selfish exercise of legal rights and a disregard of moral responsibilities. The bankruptcy statutes prescribe only the criteria needed to discharge debts; they do not say what is required to demonstrate good moral character. *Cf.* Holmes, *The Path of the Law,* 10 Harv L Rev 457, 459 (1897): "If you want to know the law and nothing else, you must look at it as a bad man, who cares only for the material consequences which such knowledge enables him to predict."

We need not decide whether we would find that applicant's moral character is wanting on the basis of his

discharge of student loans alone. We declare to all attorneys and future applicants the importance of scrupulously honoring all financial obligations. With respect to this applicant, his discharge of student loans is a fact which we consider.[5]

## REFORMATION

Applicant asserts that he has reformed himself; however, the fact that he was an adult when the actions complained of occurred causes us to approach this claim with caution. Applicant was 30 when he discharged his student loans in bankruptcy. The other acts came at an even more critical time. Applicant stole the shirt and perjured himself when he was a first-year law student. One who has set on that final stage of formal training for admission to the Bar is not still to be treated as a youth, who does not yet recognize and adhere to the rudimentary requirements of legal and moral behavior.

> "[M]embers of the bar can be assumed to know that certain kinds of conduct, generally condemned by responsible men, will be grounds for disbarment. This class of conduct certainly includes the criminal offenses traditionally known as malum in se. It also includes conduct which all responsible attorneys would recognize as improper for a member of the profession."

*In re Ruffalo,* 390 US 544, 555, 88 S Ct 1222, 1228, 20 LEd 2d 117, 125 (1968) (White, J., concurring). These same requirements attach also to law students, who will some day seek admission to the Bar.

Applicant would mimimize the theft and perjury allegations by noting that he volunteered the information about these matters to the Board of Bar Examiners. The record shows that his admissions were less soul-baring than he indicates. Our examination of the record leads us to find that applicant admitted his perjury because he believed that the Board of Bar Examiners had studied the transcript of his trial and had already discovered his perjury.

---

[5] We also note that the Bankruptcy Act of 1978 changed the law, restricting the right to discharge student loans. Under the current statutes, unless there is a showing of undue hardship, an individual must make payments on student loans for five years before they are subject to discharge in bankruptcy. *See* 11 USCA § 523(a)(8).

Reviewing the record, we are left with the impression that applicant fails to appreciate the gravity of his conduct as it pertains to his moral character. We perceive a lack of candor in his explanations of his testimony in the 1977 trial and in his answers to questions as to whether or not that testimony was truthful. His responses are inconsistent, equivocal, and evasive. In the end, we are left with the impression that applicant does not fully accept responsibility for his actions.

Applicant has submitted letters from several members of the profession in support of his application. We are also aware of applicant's academic accomplishments and other positive qualities. He has successfully completed three years of law school and passed the Bar examination. In a case of this sort, however, this court's primary responsibility is to the public, to see that those who are admitted to the Bar have the sense of ethical responsibility and the maturity of character to withstand the many temptations which they will confront in the practice of law. If we are not convinced that an applicant can withstand these temptations, we would be remiss to admit the applicant. Doubt of consequence must be resolved in favor of the protection of the public. *In re Alpert, supra.* In this case, as in *Alpert,* we have such doubt.

That is not to say that we shall forever remain unconvinced of reformation. Experience teaches that true reformation does occur. *See, e.g., In re Bernard Jolles,* 235 Or 262, 383 P2d 388 (1963). With the passage of time, this applicant may mature; his insight may develop; he may be able to show that good moral character requisite to admission to the Bar.

We hold that the Oregon State Bar is the prevailing party and that it should recover its actual and necessary costs and disbursements incurred in this proceeding. ORS 9.535(4).

Application denied and judgment awarded for the Oregon State Bar for its actual and necessary costs and disbursements incurred in this proceeding.