Submitted on the record December 11, 2007, reinstatement
denied March 27, 2008

In the Matter of
the Application for Reinstatement of

BRUCE A. GUNTER,
*Applicant.*

(SC S053579)

182 P3d 187

Bruce A. Gunter filed the briefs for himself.

Jeffrey D. Sapiro, Disciplinary Counsel, Lake Oswego, filed the brief for the Oregon State Bar.

PER CURIAM

## PER CURIAM

Applicant Bruce A. Gunter requests that this court reinstate him as an active member of the Oregon State Bar pursuant to Rule of Procedure (BR) 8.1. The Bar admitted applicant to practice in 1982. After moving to California in 1985, applicant transferred to inactive status. The Bar suspended him in 1995 for nonpayment of Bar dues. Applicant submitted a Form A (nondisciplinary) resignation in 2001. Applicant moved back to Oregon and filed an application for reinstatement in 2005. The Board of Governors determined that applicant had failed to demonstrate that he presently possessed good moral character and general fitness to practice law and recommended denying reinstatement. This court referred the matter to the Disciplinary Board. After a hearing, a trial panel issued an order denying reinstatement. The trial panel found that, in light of applicant's past alcohol and drug use, and some of his personal financial dealings, applicant had failed to demonstrate by clear and convincing evidence that he presently possessed good moral character and the requisite knowledge and legal ability to practice law. We review that order pursuant to BR 10.2. We agree with the trial panel's ultimate recommendation and deny reinstatement.

### REINSTATEMENT STANDARDS

■     BR 8.1 requires that an applicant make the following showings:

"(b)   Required Showing. Each applicant under this rule must show that the applicant has good moral character and general fitness to practice law and that the resumption of the practice of law in this state by the applicant will not be detrimental to the administration of justice or the public interest. No applicant shall resume the practice of law in this state or active membership status unless all the requirements of this rule are met.

"(c)   Learning and Ability. In addition to the showing required in BR 8.1(b), each applicant under this rule who has remained in a suspended or resigned status for more than three years or has been enrolled voluntarily or involuntarily as an inactive member for more than five years

must show that the applicant has the requisite learning and ability to practice law in this state."

The Bar has the initial burden to provide evidence that the applicant should not be readmitted to the practice of law. BR 8.13. Applicant stipulated prior to the trial panel hearing that the Bar had come forth with sufficient evidence to meet that burden. Accordingly, under BR 8.12, applicant bore the following burden of proof:

"An applicant for reinstatement to the practice of law in Oregon shall have the burden of establishing by clear and convincing evidence that the applicant has the requisite good moral character and general fitness to practice law and that the applicant's resumption of the practice of law in this state will not be detrimental to the administration of justice or the public interest."

"Clear and convincing evidence means that the truth of the facts asserted is highly probable." *In re Johnson*, 300 Or 52, 55, 707 P2d 573 (1985) (quoting *Supore et al v. Densmoor et ux*, 225 Or 365, 372, 358 P2d 510 (1961)) (internal quotation marks omitted).

With respect to good moral character, applicant must prove that he is *"in all respects * * * a person who possesses the sense of ethical responsibility and the maturity of character to withstand the many temptations which [he] will confront in the practice of law." In re Nash*, 317 Or 354, 362, 855 P2d 1112 (1993) (internal quotation marks omitted; emphasis and brackets in original). This court's concern is whether applicant presently is of good moral character. *In re Griffith*, 323 Or 99, 106, 913 P2d 695 (1996). However, evidence of past conduct "may be relevant to that issue if rationally connected to applicant's fitness to practice law." *In re Fine*, 303 Or 314, 317, 736 P2d 183 (1987).

This court addresses an analogous question concerning a lawyer's past misconduct when it considers the possible reinstatement of a lawyer following disbarment. This court has held that an attorney who seeks reinstatement after disbarment must prove that he or she "has overcome and will not again be influenced by the specific character flaw that led to disbarment." *Griffith*, 323 Or at 106. In this case, applicant has not been disbarred; applicant voluntarily resigned from

the bar in 2001. Nonetheless, the Bar submits that the same standard applies when a lawyer seeks reinstatement after engaging in conduct sufficiently serious to warrant disbarment, and that applicant's past conduct meets that criterion. Applicant does not appear to disagree with that analysis. Accordingly, we focus our inquiry on reformation. *Id.*

## FACTUAL BACKGROUND

We review the record that was before the Disciplinary Board *de novo*, pursuant to BR 10.6. We begin with a detailed consideration of applicant's personal history. Before his application to the Bar, applicant had some history of alcohol and drug use. He testified that, in high school, he had used alcohol and marijuana.[1] At the age of 18, he received a misdemeanor DUII. He continued to use alcohol and other drugs in college, but there was no evidence that any legal problems resulted from his drug use, and he graduated with honors. He then attended Lewis and Clark Law School. During his time there, he was arrested for criminal trespass in a Portland bar after the bartender stopped serving alcohol to him and he refused to leave. None of those facts prevented his admission to the Bar in 1982.[2]

Following his admission to the Bar, applicant worked as an associate at a Portland law firm. He continued to use alcohol and marijuana, but did not do so during work. However, at a firm picnic, applicant had too much to drink and engaged in a verbal confrontation with one of the partners regarding that partner's contributions to the firm. The firm promptly terminated applicant from his job.

In 1985, applicant moved to San Francisco to become a stockbroker. He transferred his Bar membership to inactive status shortly thereafter. He succeeded as a stockbroker, but he also continued drinking and began using cocaine on a regular basis. He checked into a residential treatment unit in

---

[1] Applicant's testimony on the subject of his early drug use was inconsistent. He insisted that he had used only alcohol and marijuana during high school, but other comments that he made at the hearing and in his deposition suggest that he had used other drugs, such as cocaine, during that time as well.

[2] The Bar conducted no hearing at the time of applicant's admission in 1982. The evidence discussed in this opinion was adduced on the record of the reinstatement proceeding.

1992, but relapsed soon afterwards. Applicant testified that, around 1994, he began preparing and smoking crack cocaine, and thereafter he "basically didn't stop" for about two years. At some point during that time, applicant's employer, Dean Witter Reynolds Inc. (Dean Witter), terminated his employment for job abandonment, and the Bar suspended applicant for nonpayment of bar dues. An investigative report by the National Association of Securities Dealers (NASD) regarding the dismissal stated that petitioner was fired for "failure to report to work for three consecutive days without notifying immediate supervisor." However, petitioner stated in his deposition and at trial that his job performance before the termination was "excellent," and that he suspected that the firm wanted to get rid of him without having to deal with any kind of legal complications because they suspected that he was "having issues with drugs."

The criminal behavior that concerned the Bar involved three incidents between 1994 and 1996, when applicant was using crack cocaine. First, the police arrested applicant on charges of stalking and verbally menacing his ex-girlfriend. Applicant pleaded guilty to a misdemeanor charge of stalking. He attended an inpatient treatment program at the Betty Ford Center, but relapsed shortly afterwards. Second, applicant was arrested and charged with possession of cocaine on at least one occasion. Third, applicant attempted to steal a girlfriend's car and struck a parking lot attendant with the car, after which the police arrested him on multiple charges. He pleaded guilty to a felony charge of driving under the influence of intoxicants and causing bodily injury.[3] Applicant spent a short period in jail and then attended another inpatient treatment program at Henry Ohlhoff House (HOH), and continued to attend meetings of Cocaine Anonymous (CA) for a period of four years. Applicant claimed that, subsequently, he made a conscious decision to stop attending CA due to his discomfort at spending time with former addicts and his desire to spend more time with his family.

There is no evidence of any further drug use by applicant after he left HOH in 1997, but applicant testified

---

[3] Later, the court reduced that charge to a misdemeanor and dismissed it.

that, after his probation for the DUII ended, he began drinking again. When asked why, applicant responded that it "wasn't a conscious decision" and that he had probably "had a moment of weakness," but he also testified that his current use of alcohol was infrequent. The Bar presented testimony by Dr. Walton Byrd, a specialist in addiction medicine, who stated that former addicts who remain clean and sober for five years have only a five percent chance of relapsing into addiction. However, Byrd also testified that applicant was taking a risk by continuing to drink any amount of alcohol, and that the chance of relapse for a "social drinker" such as applicant is closer to 95 percent. Byrd based his testimony about applicant's risk of relapse on a review of the records of applicant's criminal charges, a written statement of applicant's personal history, a document regarding applicant's attendance, and applicant's deposition. However, Byrd did not personally examine or evaluate applicant at any time. Nothing in the record suggests that applicant's use of alcohol has caused him actual problems since 1997.

After leaving HOH, applicant filed for bankruptcy, in which he obtained an order discharging over $236,000 in debt, including a number of credit card bills, an arbitration award that Dean Witter had obtained requiring the return of a signing bonus due to his abandonment of his job, and a judgment against him for nonpayment of rent. Applicant subsequently worked at a variety of jobs, including securities firms, a high-tech start-up company, and a subrogation management firm. Applicant and the Bar had some disagreements regarding his employment history, and we note the material disagreements below.

First, as proof of his good character, applicant claims that, while working in a clerical capacity at Global Strategies Group (Global Strategies), a brokerage firm, he acted as a source for a federal investigation of that firm's alleged involvement with organized crime. Applicant testified about his involvement with the investigation and presented the testimony of a friend and his brother-in-law that he had told them about his involvement. The trial panel noted that applicant did not present any evidence from the investigators or the government to corroborate his testimony. The trial panel

found that applicant's involvement, as noted, did not independently establish his good moral character, but did support his claim that he left Global Strategies due to factors that were beyond his control. We agree.

Second, after his DUII, applicant was subject to statutory disqualification from the securities industry. In 1997, applicant persuaded Lee Epstein, Chief Executive Officer of Money Market One Investments (Money Market One), to sponsor his efforts to regain his securities license from NASD. Money Market One prepared a supervisory plan that provided that Epstein would supervise applicant "in close physical proximity" to Epstein, and that applicant would not interact with retail customers. Applicant stated in his deposition that Epstein "went through a fair amount of trouble" to help him recover his NASD registration. However, applicant did not take a position with Money Market One and, thus, did not obtain registration with NASD. He asserted that Epstein had not offered him adequate compensation for his work and that Epstein was "taking advantage" of him. In 1999, applicant accepted a job with Advanced Precision Technologies (APT), a high-tech start-up company.[4]

Third, in 2005, applicant had a series of disputes with management at American Commercial Claims Administrators (ACCA), a subrogation management firm that he had joined in 2002. Applicant presented a series of memoranda that he had sent to management in January and March 2005, detailing possible conflicts of interest that he believed the company should have brought to the attention of its clients. Applicant testified that the circulation of those memoranda led to the firing of his immediate supervisor and to a pattern of harassment of him by her replacement, and that he ultimately accepted a severance package in August 2005 out of fear that, if he stayed with the firm, he would "end up just being fired or worse."

Shortly after leaving ACCA, applicant and his wife filed for bankruptcy and moved to Portland. Applicant and

---

[4] As we discuss below, after leaving APT, applicant went on to work for other securities firms.

the Bar dispute the circumstances surrounding that move and the motives behind it. The Bar asserts that the move, the filing for bankruptcy, and applicant's loss of his job were "part of a coordinated plan to obtain a new home in Portland at the expense of his past creditors." Applicant insists that filing for bankruptcy was "the most sensible legal alternative" given his situation. As the trial panel noted, the testimony surrounding those events was "confusing and prolonged, but it is important to try and establish the timeline of events and then consider each side's interpretation of what the evidence supports."

Applicant and his wife testified that, despite a combined income of over $100,000, they were having difficulty providing for themselves and their two small children due to high living expenses in San Francisco. They accumulated a considerable credit card debt and had outstanding federal and state tax liens. Applicant and his wife testified that their debt reflected everyday expenses, particularly child care, and that, in 2005, they began to consider moving to another city with less expensive housing and better public schools. Applicant and his wife decided to move to Portland, and traveled there at least twice prior to July 2005 to look for work.

In late July and early August 2005, applicant and his wife obtained approval for two home loans of approximately $80,000 and $330,000. The applications were prepared by a mortgage broker named Thomas Weed. Applicant testified that, when he signed the applications for the loans, the sections listing liabilities were blank, that his wife, not he, primarily had arranged the loans, and he "probably pretty much just signed it at * * * [his wife's] request and direction." Weed testified that it was his normal practice to instruct borrowers to leave those sections blank and fill them out himself based on credit reports. Applicant also had failed to disclose his existing federal tax liens on the application, but Weed testified that he believed that applicant's wife had disclosed the existence of those liens, and that he had not included them on the application because the lender did not require information about that kind of debt. We credit Weed's testimony. The sale of the house closed in August.

Meanwhile, as mentioned earlier, applicant was involved in escalating disputes with his employer, ACCA, that led to his acceptance of a severance package. Applicant's wife testified that she already had been taking medication for anxiety and depression at that point and, when applicant's severance payment turned out to be far lower than she had expected, she suffered a nervous breakdown and was unable to start work in Portland. Applicant's wife applied for disability payments in September 2005, listing her mother's address in California as her address. She continued to receive payments at that address until September 2006, nearly a year after she had moved to Oregon. When asked why she had continued to use the California address, applicant's wife testified that she had been following the advice of her doctor. Likewise, applicant applied for unemployment insurance at the end of August 2005, listing his mother's address in California as his address. Applicant testified that he had done that because he did not know where he would be living, even though he and his wife had already purchased the house in Oregon.

At the end of September 2005, applicant and his wife filed for bankruptcy and ultimately obtained an order discharging approximately $89,000 of credit card debt and $6,000 of past due rent on their California apartment. The address of applicant's apartment was the only address that applicant provided on the petition, but applicant and his wife did list their recently purchased Oregon home among their real property. Applicant and his wife testified that they had ceased paying rent on their apartment due to a dispute with their landlord. Specifically, they claimed that one of the tenants was disrupting their right of quiet enjoyment and the landlord had refused to take any action in response. The trial panel noted that the owed rent was for part of August and September, after applicant and his wife had closed their purchase of the house in Portland. Applicant and his wife moved to Oregon shortly afterwards. Since then, applicant's wife has obtained employment as a real estate agent, while applicant works as a realtor and cares for their children.

As evidence of his good character, applicant offered the testimony of William Karger, a friend of his from high school; Douglas Moore, his brother-in-law; and Carolyn

Gunter, his wife. Their testimony centered primarily on the fact that applicant generally had changed for the better since he ended his drug use, and had become a responsible and loving husband and father. To the same effect, applicant offered letters from Suzette Callejo, a friend of his wife's, and Claire Twomey, their former nanny. Applicant also offered a letter from Raymond Montgomery, a coworker of applicant's from ACCA, and notes made from phone conversations between the Bar and other former coworkers at ACCA, as evidence of his ethics on the job.

## SUBSTANCE ABUSE ISSUES

■      With respect to his history of drug and alcohol abuse, applicant must demonstrate "adequate resolution of any previous substance abuse problem[.]" *Griffith*, 323 Or at 107 (citing *In re Rowell*, 305 Or 584, 591, 754 P2d 905 (1988)). The Bar urges that, if applicant fails to demonstrate "clear insight" into the reasons for his prior drug abuse or the danger that he will relapse into such behavior, then that failure raises "substantial doubts" as to his good moral character. *In re Covington*, 334 Or 376, 386, 50 P3d 233 (2002).

Applicant argues that he has demonstrated adequate resolution of his previous substance abuse problems because he has not used drugs or had problems with law enforcement since completing treatment at HOH in 1997. Applicant also insists that his personal and professional achievements since that time demonstrate that he has regained his good moral character. Finally, applicant asserts that this court's decisions in *Rowell*, *Covington*, and *In re Beers*, 339 Or 215, 118 P3d 784 (2005), warrant his reinstatement.

The Bar responds that applicant is at risk for future substance abuse due to his continued social drinking. The Bar cites Byrd's testimony that former addicts who continue to drink in moderation have a 95 percent chance of relapsing into abuse. The Bar also states that, while applicant frequently suggested that he understood the "issues" underlying his problems with drugs and alcohol, he never identified what those issues were or how he had dealt with them.

We first examine the cases that applicant cites. In *Rowell*, the applicant had smoked marijuana since his teenage years, and sold marijuana and amphetamines as a college student. 305 Or at 587. Rowell had been arrested and charged with several offenses including possession of marijuana with intent to sell and possession of cocaine, and had violated the conditions of his probation more than once. He also had a history of alcohol abuse. *Id.* at 587-88. He eventually entered a rehabilitation program and stopped using cocaine, but continued to drink socially, and continued to smoke marijuana until two years before his application to the Bar, which was four years before the court issued its decision. *Id.* at 588-89. However, Rowell also presented evidence of positive changes in his life, including character references from people who had known applicant long enough to observe a significant change in his character. *Id.* at 590. This court found that the "slow, steady change in applicant's activities" showed a "maturation process" that had started years before and had steadily continued:

> "In applicant's case, we find that four years without engaging in the activities that evidenced his former unsatisfactory character are sufficient to indicate that he has changed. His personal, academic, professional and other achievements in the last four years all support the conclusion that applicant now is of good moral character."

*Id.* at 592. We allowed Rowell's application for admission. *Id.* at 593.

In *Covington*, the applicant had begun drinking alcohol and using marijuana at the age of 13, continued that behavior for several years, and was convicted of several misdemeanors due to behavior arising from his drinking and drug use. 334 Or at 378. Covington began attending Alcoholics Anonymous (AA) meetings and remained sober for a year, but eventually relapsed; that pattern of recovery and relapse recurred over several years. *Id.* at 378-79. Eventually, during law school, Covington "hit bottom" and was using heroin, cocaine, and methamphetamine. *Id.* at 379. Covington began attending meetings of the Oregon Attorney Assistance Program (OAAP) and AA, and remained sober from that time forward. *Id.* However, the Bar presented testimony by a psychologist, who had evaluated Covington at the Bar's request,

that Covington had a "defensive style" and "tendency to rationalize or externalize events," both of which increased his risk of relapse. *Id.* at 386. This court noted that Covington lacked "clear insight" into the reasons for his drug abuse and the danger that he could relapse, that his most recent drug use was "the most serious of his entire history," and that the three years between his most recent drug use and the court's decision were not "sufficient to overcome the concerns that [his] psychological profile and history of past relapses have generated." *Id.* at 386-87. We denied the application for admission. *Id.* at 387.

In *Beers*, the applicant had a long history of using drugs, including marijuana and cocaine, as well as convictions for felony possession and various misdemeanors related to his use of drugs. 339 Or at 217. Eventually, Beers was convicted of conspiracy to distribute cocaine and sentenced to prison. *Id.* at 218. Beers stopped using drugs and began to turn his life around while in prison. On release, he successfully held a variety of jobs and completed law school. His last use of drugs had occurred over a decade before the court's decision. *Id.* at 218-20. At Beers's character and fitness hearing, Dr. Blakeslee, a psychologist who had evaluated Beers at the Bar's request, testified that Beers had the moral character and fitness to be a lawyer. Blakeslee was aware that Beers continued to drink alcohol in moderation, and that Beers had had one alcohol-related legal problem during law school, when he jaywalked in front of a police officer while intoxicated. Nonetheless, Blakeslee testified that Beers did not suffer any addiction that would compromise his abilities as a lawyer, and that Beers's likelihood of a relapse was marginal based on Beers's prolonged sobriety, stable employment, and marriage. *Id.* at 222-23. This court ultimately allowed Beers's application, noting that there was "no basis on this record" for questioning Blakeslee's conclusions. *Id.* at 226.

We announced in *Rowell* that:

"The length of time without evidence of unsatisfactory character needed to permit the conclusion that the actor is now of good moral character varies with, among other things, the person's age, the length of time that the unsatisfactory

characteristics were evident and the nature of the unacceptable behavior."

305 Or at 592. Applicant in this case has a long history of drug and alcohol abuse, arguably lasting from his teenage years until his work as a stockbroker during the 1990s, when he was using crack cocaine. The nature and extent of applicant's abuse were serious. He has been arrested for DUII, criminal trespass, stalking, and vehicular assault. His alcohol and drug abuse have resulted in his termination from at least one job and probably two. Applicant's history of abuse is at least as serious, if not more, as that of the applicants in *Rowell*, *Covington*, and *Beers*. However, applicant also has been free of drug abuse for over a decade, and apparently has remained drug free during stressful situations, including his dispute with ACCA, his bankruptcy, his wife's nervous breakdown, and his move to Portland. Thus, applicant has been free of drugs for over twice as long as the applicant in *Rowell*, and for nearly as long as the applicant in *Beers*.

The Bar nonetheless argues that applicant's occasional alcohol consumption may cause problems in the future. On similar facts, this court has rejected a similar argument in both *Rowell*, 305 Or at 589, and *Beers*, 339 Or at 226. However, the Bar relies on the testimony of Byrd that applicant's history "demonstrates that he suffers from the disease of addiction" and that, because applicant suffers from that disease, his social drinking puts him at a 95 percent chance of relapse. Byrd testified that he based his testimony on his review of applicant's criminal record, the records of applicant's treatment at HOH, and applicant's deposition before the Bar; however, as noted, Byrd did not interview or meet with applicant at any time.

The evidence about whether applicant has overcome his addiction to drugs is undermined at least to some degree by Byrd's testimony suggesting that there is a very high likelihood of a relapse into addiction due to applicant's continued consumption of alcohol. In our view, the evidence regarding applicant's moral character in that regard is in conflict. We cannot find that his drug and alcohol habits presently affect

his ability to practice law and constitute a danger to the public. We also cannot find affirmatively that applicant has overcome his drug and alcohol habits so that he is not a danger to the public. Applicant bears the burden of proof on that question and must carry that burden by clear and convincing evidence. We find that applicant has failed to carry his burden of proof.

## ISSUES REGARDING EMPLOYMENT HISTORY AND FINANCIAL DEALINGS

■ Some aspects of applicant's employment history give us greater cause for concern than his past substance abuse. First, there is his termination from Dean Witter. The record shows that, after terminating applicant's employment, Dean Witter sought an arbitration award against applicant due to his retention of a substantial signing bonus. Dean Witter won an award of over $100,000 against applicant, which it later reduced to a judgment. Applicant discharged that obligation when he filed for bankruptcy in 1997. We have found in the past that an applicant's lack of interest in making restitution to those harmed by his past misconduct weighs against his claim for reinstatement. *In re Graham*, 299 Or 511, 520-21, 703 P2d 970 (1985). Here, when the trial panel asked applicant whether he had attempted to make amends with Dean Witter and his other past creditors, applicant responded that he "didn't give that a lot of thought," but acknowledged that his behavior was selfish.

Second, there is the matter of applicant's relationship with Money Market One. As mentioned above, applicant was subject to a statutory disqualification by the NASD due to his 1996 conviction for driving under the influence of intoxicants and causing bodily injury. The record shows that, in May 1997, Money Market One applied to NASD to employ applicant as a registered representative selling money market investments and proposed to provide a particular supervisory plan for applicant. Applicant never went to work for Money Market One, in part because he felt that he was being taken advantage of. Applicant acknowledged in his deposition that Epstein of Money Market One "went through a fair amount of trouble" to help him regain his license and "was

pretty pissed off about the whole thing." Applicant insisted that he did nothing wrong. However, in light of Epstein's reaction, this event demonstrates that applicant had a difficult relationship with that business entity.

None of the issues raised by applicant's employment history are dispositive of his application, but they do undermine his claim to good moral character to some extent. The trial panel interpreted applicant's history negatively as showing "evidence of situational ethics." We agree.

We have often considered evidence of an applicant's handling of financial affairs in assessing whether he or she is of good moral character. *See In re Taylor*, 293 Or 285, 293, 647 P2d 462 (1982) (listing cases). Applicants are "expected to honor scrupulously all financial obligations." *In re Scallon*, 327 Or 32, 39, 956 P2d 982 (1998). In the cases of applicants previously disbarred for misconduct who are "still in financial trouble," we have expressed concern at the "danger that [the] continuing pressure of financial need may again lead the [applicant] to violate the law and his professional trust." *In re Koken*, 214 Or 357, 362, 329 P2d 894 (1958). In this case, applicant's personal financial dealings gave the Bar cause for concern. The trial panel was primarily troubled by the applicant's recent applications for home loans, applications for unemployment benefits, and bankruptcy filings. We deal with each of those in turn.

Applicant signed home loan applications that left the liability information blank, and relied on the mortgage broker to fill in that section with information from the applicant's credit report. The Bar insists that this "hardly reflects the level of responsibility expected of lawyers when it comes to reading and signing important legal documents." We disagree. The mortgage broker testified credibly that, consistent with his normal practice, he had instructed applicant and his wife to leave the liability information blank. Applicant's inattention to the significance of the blanks was somewhat irregular and less than commendable, but we are not convinced that his failure to second-guess his mortgage broker raises doubts as to his good moral character.

■     The Bar also argues that the loan application failed to disclose the tax debt that applicant and his wife were paying off at the time, that a question on the application "clearly called for such disclosure," and that applicant signed the loan application solely on the strength of his wife's assurance that the mortgage broker had stated that the ultimate lender would not require that information. Again, the Bar argues that that behavior reflects a lack of responsibility on applicant's part. The trial panel apparently agreed:

> "[T]he facts are that even by his testimony he signed blank forms * * *, and too readily relied on the advice and interpretation of others such as the mortgage broker or his wife. The role of the attorney is to take responsibility for the legal meaning of what he is signing."

The trial panel apparently believed that applicant's responsibilities as an attorney required him to second-guess and refuse to cooperate with both his wife and the mortgage broker. At least in these circumstances, we disagree. The text of the loan application arguably called for applicant to disclose existing tax debt, but it was not clear. The mortgage broker testified credibly that applicant's wife had disclosed the existence of a tax lien to him, and testified that he had told applicant's wife that the lender did not require that information. We do not believe that applicant acted unreasonably in relying on the mortgage broker's statements. Nor are we prepared to announce that, as a rule, a lawyer must insist on including information on a loan application when a mortgage broker states that such information is not required. We reject the Bar's argument that applicant's behavior with regard to the loan applications reflects badly on his character.

     The Bar also raised the question of applicant's application for unemployment benefits. The trial panel noted that applicant gave his mother's address in California on his application for unemployment benefits, despite the fact that he had already closed his purchase of the house in Oregon. The trial panel, however, did not find that that action indicated some kind of fraud on applicant's part. In our view, the evidence on that question is not conclusive; it neither helps nor hurts applicant's case and we do not attach great significance to it.

We are more concerned by applicant's bankruptcies. The fact that applicant filed for bankruptcy, standing alone, is not a factor that we consider in determining whether he has good moral character. *Taylor*, 293 Or at 293. However, the bankruptcy statutes do not prevent us from examining the circumstances surrounding the bankruptcies, "as these circumstances illustrate an applicant's judgment in handling serious financial obligations." *Id.* A bankruptcy does not reflect adversely on an applicant's character if it is compelled by an "extraordinary hardship," such as "an unusual misfortune, a catastrophe, an [overriding] financial obligation, or unavoidable unemployment." *Id.* at 294 (quoting *In re Gahan*, 279 NW2d 826, 831 (Minn 1979)). On the other hand, we may find that applicant lacks good moral character if the circumstances of the bankruptcy "show a selfish exercise of legal rights and a disregard of moral responsibilities." *Id.* We have held, however, that for an applicant seeking admission to the bar, a past bankruptcy does not disqualify the applicant *per se. Scallon*, 327 Or at 39.

*Scallon* is instructive on that point. In *Scallon*, several years before applying for admission to the Oregon State Bar, the applicant had filed for bankruptcy after several of his creditors on his student loans sued him or threatened to sue. *Id.* at 35. By Scallon's own admission, he had defaulted on those loans because of poor handling of his financial affairs. *Id.* at 35-36. This court held, however, that the bankruptcy was no reason to disqualify Scallon from admission:

> "[W]hen applicant could not manage his affairs successfully, and when his failure led to several legal actions being filed or threatened against him, he was as entitled as any other debtor to seek protection from his creditors in bankruptcy. * * * We decline to hold that a bankruptcy in the history of an applicant for admission to the Bar *per se* is disqualifying, even if it appears that the financial difficulties that led to the bankruptcy were the fault of the applicant."

*Id.* at 39. After the bankruptcy, however, Scallon continued to experience financial difficulties due to his mishandling of his money, and fell behind on his tax payments. That did not disqualify him, either, because he had always filed returns and acknowledged the taxes that he owed, and for the most part, he had paid them. *Id.* at 41. Additional evidence showed

that, while this court was holding Scallon's case under advisement, he satisfied all of his delinquent tax obligations. *Id.* at 38. This court held that the record contained sufficient evidence of financial responsibility to justify Scallon's admission:

> "It * * * appears to us that applicant understands and appreciates the reasons that led to his past financial difficulties, is determined to avoid their repetition, and is capable of carrying out that determination. In that regard, applicant is willing to accept the recommendation * * * that he be admitted conditionally."

*Id.* at 42. Accordingly, we admitted Scallon subject to several conditions. *Id.*

Applicant's situation in the 1997 bankruptcy is not identical to Scallon's. For one thing, Scallon's bankruptcy was precipitated purely by his poor money management; applicant's was prompted by debt that he had accumulated largely due to his drug addiction. For another, the debts discharged in the bankruptcy proceedings were different: Scallon's only significant debt was about $27,000 in student loans, whereas applicant discharged over $200,000 of debt including consumer debt, a judgment for unpaid rent, and the aforementioned judgment obtained against him by Dean Witter. However, both Scallon and applicant "could not manage their affairs successfully," and that failure "led to several legal actions being filed or threatened" against them.[5] Both applicants were entitled to seek protection from their creditors in bankruptcy.

We are more concerned with applicant's behavior after the 1997 bankruptcy. Scallon accumulated tax debt after his bankruptcy due to his irresponsible financial behavior, but he paid off all that debt. *Id.* at 36-38. Applicant, like Scallon, accumulated federal and state tax debt between 2002 and 2005, as well as approximately $95,000 of consumer debt. Applicant sought to then discharge his consumer

---

[5] For example, by the time applicant filed for bankruptcy, Dean Witter had already obtained its arbitration award against him and reduced that award to a judgment.

debt through yet another bankruptcy proceeding in 2005.[6] There is no evidence that applicant's creditors had filed or threatened suit against him. The timing of the bankruptcy petition was particularly troubling: applicant filed after taking on over $400,000 of additional debt for a new house. The fact that applicant sought bankruptcy protection twice in eight years, and that he bought a house less than three months before filing the second time, suggests that, unlike Scallon, applicant does not appreciate the reasons for his past financial difficulties and is not particularly determined to avoid their repetition.

Applicant nevertheless insists that the debt that he and his wife discharged in bankruptcy was primarily due to "unforeseen expenses," particularly child care, and that he and his wife purchased a house in Portland to get out of debt and begin building up equity. Even if we accept those claims at face value, they do not establish that applicant was compelled to file for bankruptcy by any extraordinary hardship. The expenses that come with raising a family generally do not qualify as an unusual misfortune. They are a necessary burden that everyone who chooses to raise a family knows that they must bear. The fact that applicant discharged those expenses in bankruptcy after taking on a much larger debt for a new home suggests that applicant viewed the bankruptcy proceeding as a convenient means of escaping the consequences of his own inability to manage finances, rather than as a remedy of last resort for unforeseen expenses.

Applicant also asserts that his decision to file for bankruptcy was motivated by the fact that he and his wife had both lost their jobs. As stated above, a bankruptcy will not reflect adversely on applicant's character if it is motivated by an extraordinary hardship, such as unforeseen unemployment. We are not convinced, however, that this unemployment was entirely unforeseen. The internal memoranda that applicant submitted as exhibits indicate that he was having difficulties with his supervisor at ACCA as early as April, and applicant's testimony indicated that those difficulties had become severe by late July or early August,

---

[6] Applicant testified that he is in the process of paying his tax debt.

when he and his wife obtained the loan. Applicant's testimony also indicates that, when he and his wife visited Portland in June and July, he was already looking for a new job. In other words, applicant and his wife took on over $400,000 of debt, over and above their existing consumer and tax debt, at a time when applicant should have known that his job was in jeopardy. That action suggests that applicant's sense of financial responsibility was not much greater in 2005 than it was in 1997.

Applicant's character references also do not help him here. Applicant's friend, Karger, and brother-in-law, Moore, both testified that applicant had become more responsible as a husband and father, but cross-examination revealed that neither witness was aware of the details of applicant's financial situation. Much of the character testimony that applicant presented describes him as "responsible," but does not support applicant's specific claim that he has become more fiscally responsible since the 1997 bankruptcy. Even if it did, we would be inclined to give more evidentiary weight to the bankruptcies themselves and the circumstances surrounding them, as we discussed above.

Applicant has filed for bankruptcy twice in a span of eight years, discharging similar consumer debts in the process and purchasing a new house shortly before the later filing. The circumstances surrounding the bankruptcy raise doubts as to the applicant's moral character. We do not necessarily agree with the Bar's contention that those events indicate "a coordinated plan to obtain a new home in Portland at the expense of his past creditors." However, we are left with a substantial doubt whether applicant is prepared to honor his financial obligations in the manner expected of lawyers admitted to the Bar.

## FINDINGS AND CONCLUSION

We find that applicant has failed to prove by clear and convincing evidence that he has good moral character and general fitness to practice law and that the resumption of the practice of law in this state by him will not be detrimental

to the administration of justice or the public interest. Therefore, under BR 8.1, we deny his application for reinstatement to the Oregon State Bar.

Reinstatement denied.